## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| FLEXSHOPPER, INC., <br><br> Plaintiff, <br><br> v. <br><br> UPBOUND GROUP, INC., ACIMA HOLDINGS, LLC (d/b/a ACIMA LEASING), and ACIMA DIGITAL, LLC (d/b/a ACIMA LEASING). <br><br> Defendants. | CIVIL ACTION NO. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff FlexShopper, Inc. ("FlexShopper" or "Plaintiff"), by and through its undersigned counsel, complains and alleges as follows against Upbound Group, Inc. ("Upbound"), Acima Holdings, LLC (d/b/a "Acima Leasing"), and Acima Digital, LLC (d/b/a "Acima Leasing") (collectively "Acima" or "Defendants").

## THE PARTIES

1.      FlexShopper is a Delaware Corporation, with its principal place of business located at 901 Yamato Road, Ste. 260, Boca Raton, Florida, 33431.

2.      Upon information and belief, Upbound Group, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 5501 Headquarters Drive, Plano, Texas, 75024.

3.      Upon information and belief, Acima Holdings, LLC is a limited liability company organized and existing under the laws of the State of Utah. According to its state corporate filings in at least Utah, Acima Holdings, LLC's principal office and regular and established place of

business is located at 5501 Headquarters Drive, Plano, Texas, 75024 and its registered Managers are Mitchell Fadel, Fahmi Karam, and Bryan Pechersky, who are all located at this same address. Upon information and belief, Acima Holdings, LLC is a subsidiary of Upbound Group, Inc.

4.      Upon information and belief, Acima Digital, LLC is a limited liability company organized and existing under the laws of the State of Utah.  According to its state corporate filings in at least Utah, Acima Digital, LLC's principal office and regular and established place of business is located at 5501 Headquarters Drive, Plano, Texas, 75024.  According to its state corporate filings in at least Texas, Acima Digital, LLC and Upbound Group, Inc. share the same CEO (Mitchell Fadel), Treasurer (Fahmi Karam), and Secretary (Bryan Pechersky), who are all located at the same Plano, TX office.  Upon information and belief, Acima Digital, LLC is a subsidiary of Acima Holdings, LLC and both have the same corporate officers.

5.      Upon information and belief, Acima Holdings, LLC and Acima Digital, LLC do business as "Acima Leasing," which is not a legal entity.  Acima Leasing regularly publishes press releases identifying Plano, Texas as its place of business.  *See* https://www.acima.com/news.

## NATURE OF THE ACTION

6.      This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*.

7.      Defendants have infringed and continue to infringe, have contributed to and continue to contribute to the infringement of, and have actively induced and continue to induce others to infringe the following FlexShopper patents:

- U.S. Patent No. 10,089,682 (the "'682 Patent");

- U.S. Patent No. 10,282,778 (the "'778 Patent");

- U.S. Patent No. 10,891,687 (the "'687 Patent");

2

- U.S. Patent No. 11,966,969 (the "'969 Patent"); and

- U.S. Patent No. 12,067,611 (the "'611 Patent" and, collectively, the "Asserted Patents").

8.    FlexShopper is the legal owner by assignment of the Asserted Patents, which were duly and legally issued by the United States Patent and Trademark Office.

9.    Plaintiff seeks injunctive relief and monetary damages.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.    This Court has personal jurisdiction over Defendants in this action because Defendants have committed acts within this District giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.  Defendants have committed acts of patent infringement and have regularly and systematically conducted and solicited business in this District.

12.    For example, upon information and belief, Defendants provide "eCommerce lease-to-own solution[s]" to third-party e-commerce entities (*e.g.*, online retailers) that are located in this District and/or sell goods to consumers in this District.  *See, e.g.*, https://www.acima.com/en/ecommerce.  These "solutions" include products, such as software, website "plug-ins," and/or related hardware that Defendants provide to e-commerce entities for integration into e-commerce websites.  For example, Defendants make webpage "plug-ins" that are incorporated into the third-party e-commerce websites that allow the e-commerce entities to

accept "lease-to-own" payment arrangements for goods from consumers in this District.[1]  As explained elsewhere herein, Defendants' products and services, together with or without software, hardware, and systems associated with the third-party e-commerce entities and consumers, directly and indirectly infringe the Asserted Patents.

13.    Upon information and belief, Defendants also own, operate, and/or are affiliated with www.acima.com ("Acima Website"), which is readily accessible by individuals in this District and promotes Defendants' infringing products and services to consumers and e-commerce entities that do business in this District.  For example, the Acima Website provides information about Defendants' business and products/services, explaining that Defendants provide "flexible, lease-to-own solutions [that] can help you take home a new sofa, TV, mattress, mobile phone, tires and more."  *See* https://www.acima.com/en.  "Acima helps people from all backgrounds live a better quality of life with easier access to the things they need and want—all without credit.  Our proprietary technology enables consumers to shop through our mobile app, online, or in stores at thousands of retailers across the nation.  And applying for a lease agreement is quick and simple—with flexible purchase options that enable consumers to attain ownership whenever they're ready."  *See* https://www.acima.com/en/about-us.  Upon information and belief, Defendants also provide Acima's lease-to-own products and services at numerous retail store locations in this District.  *See, e.g.,* https://www.acima.com/en/find-a-store; https://www.acima.com/en/partner.

---

[1]    Upon information and belief, www.JustWheelsDirect.com is one example of an e-commerce entity that uses Defendants' infringing lease-to-own plug-in that enables the e-commerce entity to accept lease-to-own payment arrangements for goods that it sells.  *See, e.g.,* https://justwheelsdirect.com/acima/.  Upon information and belief, www.justwheelsdirect.com is readily accessible and ships goods to consumers in this District.  Upon information and belief, there are numerous other e-commerce entities that use Defendants' infringing products and sell goods based on a lease-to-own basis to consumers in this District.  *See, e.g.,* https://www.acima.com/en/ecommerce; https://www.acima.com/en/how-it-works.

14.    Upon information and belief, Defendants' principal office, a regular and established place of business, is in this District.  *See supra*, ¶¶2-5.  Upon information and belief, Defendants' corporate officers are also in this District.  *Id.*

15.    Upon information and belief, Defendants also employ numerous individuals in this District.  *See* https://www.linkedin.com/company/acimaleasing/people/ (Acima's[2] LinkedIn page identifying 59 employees in Texas)[3]; https://www.linkedin.com/company/upboundgroup/people/ (Upbound Group's LinkedIn page identifying 64 employees in Plano, Texas).  Upon information and belief, Defendants are also currently recruiting additional employees in this District.  *See, e.g.*, https://www.linkedin.com/jobs/view/3994129807/ (job posting for "onsite" "Senior Principal, Privacy" in Plano, TX for Upbound Group); https://www.linkedin.com/jobs/view/4001251487/ (job posting for "onsite" "Senior Manager Quality & Digital Assurance" in Plano, TX for Upbound Group); https://www.linkedin.com/jobs/view/3998541523/ ("onsite" "Group Delivery Director-Digital Commerce" in Plano, TX for Acima).

16.    For at least the foregoing reasons, Defendants are subject to this Court's jurisdiction pursuant to due process and the Texas Long Arm Statute because they have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.

---

[2]  The LinkedIn page for "Acima" does not distinguish between Acima Holdings, LLC or Acima Digital, LLC, which further reinforces that Acima Holdings, LLC is a shell holding company of Acima Digital, LLC, and the offices, officers, employees, assets, liabilities, etc. of Acima Digital, LLC are attributable to Acima Holdings, LLC.

[3]  On information and belief, at least some of the employees in Texas are employed in this District, given that Acima Holdings, LLC's and Acima Digital, LLC's registered place of business and their corporate officers are in this District, and given that Defendants provide Acima's lease-to-own products and services at numerous retail store locations in this District, and Defendant employees people who work at and/or service these retail store locations.

17.     Venue is also proper in this District under 28 U.S.C. § 1400(b) because the facts above establish that Defendants have committed acts of infringement and have a regular and established place of business in this District.  For example, Defendants' principal office is in this District; Defendants' corporate officers are in this District; Defendants employ numerous other individuals in this District; Defendants provide infringing products and services to consumers and third-party retailers in this District; Defendants provide Acima's lease-to-own products and services at retail store locations in this District; and Defendants own, operate, or are affiliated with a website that is accessible in this District and that promotes Defendants' infringing products and services to consumers in this District.  *See supra*, ¶¶12-15.

## FACTUAL BACKGROUND

### Plaintiff FlexShopper, Inc.

18.     Founded in 2006 and headquartered in Boca Raton, Florida, FlexShopper is an innovative and successful financial technology company that provides competitive payment options to consumers.  In particular, FlexShopper enables consumers to shop for brand name electronics, home furnishings, and other durable goods on a rent-to-own (also referred to as lease-to-own) basis.  In some aspects of its business, FlexShopper partners with leading e-commerce entities (*e.g.*, online retailers) to provide competitive lease payment options along with flexible terms that are designed to help customers achieve merchandise ownership, including through low initial payments and early buyout options.  These partnerships depend on FlexShopper's patented technological innovations.

19.     FlexShopper researched and developed technology that allows it to integrate with websites of e-commerce entities to provide consumers using those e-commerce websites the option to purchase goods from those e-commerce entities on a rent-to-own basis.  FlexShopper's patented technology provides seamless integration with such websites so that consumers can seamlessly

purchase their goods on a rent-to-own basis through the e-commerce websites.  This enhances both the customer and retailer experience by providing an easy, reliable, and efficient means to sell/purchase a wide variety goods on a rent-to-own basis.  FlexShopper patented this innovative technology to protect its substantial R&D investments.

20.    FlexShopper's innovations have proven very successful.   In 2023 alone, FlexShopper generated approximately $132 million in gross lease revenues and fees.

## **The Inventive Technology**

21.    "Rent-to-own" or "RTO" refers in the industry to a rental-purchase agreement in which goods are leased/rented in exchange for regularly scheduled payments, with the option to purchase the goods at some point in the future.  RTO transactions also typically allow the consumer to return the goods and end future payment obligations and, consequently, the goods that are eligible for RTO transactions are typically durable goods, such as furniture, electronics, appliances, musical instruments, jewelry, certain automotive parts and accessories, among other things.  RTO transactions are appealing to consumers who cannot afford, or do not wish, to pay for the goods in full at the time of payment, and also cannot or do not want to incur the long-term financial obligations associated with traditional credit sales.

22.    Traditionally, consumers interested in acquiring goods on an RTO basis had to visit a brick-and-mortar RTO store.  However, the selection of goods available at a single RTO store is inevitably limited compared to the assortment of goods collectively available at traditional retailers at large, including both brick-and-mortar and online retailers.  Moreover, in many instances, physically going to a brick-and-mortar RTO store is less convenient for consumers than acquiring goods from e-commerce retailers.  More recently, consumers interested in acquiring goods on an RTO basis also had the option to do so via specialized e-commerce channels.  However, the

selection of goods available to consumers through such channels was still limited compared to the assortment of goods collectively available through e-commerce merchants at large. Moreover, the process for completing a purchase on an RTO basis via e-commerce channels was overly time-consuming and cumbersome for consumers. At the same time, it was overly complicated for traditional e-commerce merchants to provide an RTO payment option to their customers. This meant fewer available options for consumers, and fewer sales for merchants.

23.    The patented technology in the Asserted Patents addresses the problems above by providing consumers the opportunity to acquire goods on an RTO basis from many different traditional e-commerce retailers in a fast, efficient, easy, and accurate manner. The patented technology benefits both consumers and online retailers. It provides consumers a greatly expanded universe of goods from many different retailers that can be acquired from e-commerce retailers on an RTO basis, and it makes the transaction process easier to complete. For example, once consumers have selected the goods they want to buy on an RTO basis, the patented technology helps make the checkout process short and easy to navigate. The technology also benefits e-commerce retailers by making it easier to provide their customers with an RTO option, allowing them to make sales to consumers who they would otherwise miss out on, including consumers who cannot or do not wish to purchase goods upfront for the full cash price or use traditional credit options, such as credit cards, to finance the purchases.

24.    Additionally, the patented technology allows e-commerce servers the ability to provide consumers with RTO user interfaces received from an RTO management application (*e.g.*, an RTO financial services entity) to facilitate the RTO transaction through the e-commerce website. Facilitating RTO transactions in this way allows the e-commerce server/website to retain better control over its consumers and makes for a seamless, easy, and efficient RTO transaction

checkout process.  On information and belief, this also minimizes cart abandonment and leads to higher sale conversion rates for the e-commerce merchants.

25.     The above advantages make the patented technology important and valuable to both consumers and businesses alike.

## The Asserted Patents and Patent Eligibility Under 35 U.S.C. § 101

26.     The claims of the Asserted Patents are patent eligible under 35 U.S.C. § 101.  They are directed to systems and methods, which are among the four statutory categories of inventions that Congress has deemed to be appropriate subject matter for patenting.  Moreover, the claims of the Asserted Patents are not directed to a judicial exception, as they are not limited to abstract ideas, laws of nature, or natural phenomena, and they also recite additional limitations amounting to significantly more than an abstract idea.

27.     The claim limitations of the Asserted Patents, as a whole, specify a particular technological means to achieve a desired result, and so are directed to patent-eligible technological improvements.  The claims of the Asserted Patents are directed to specific arrangements of computer systems and software components installed on those systems to provide specific user interfaces that serve as a technological means to achieve a solution to a technological problem.  Moreover, the non-abstract improvements specified by the ordered combination of the claim limitations also provide unconventional, non-routine, inventive concepts that also confer patent eligibility.

28.     Prior to the innovations disclosed in the Asserted Patents, consumers interested in acquiring goods on an RTO basis typically had to patronize a brick-and-mortar RTO store that specialized in offering a limited number of goods on an RTO basis.  The problem with such a store, however, is that it inherently has a limited selection of goods by virtue of being a single physical

9

store.  Consumers seeking RTO goods would miss out on the virtually unlimited selection of goods collectively available at other, non-RTO retailers at large.  Moreover, brick-and-mortar RTO stores require the consumer to physically go to their location, which consumers find is less convenient than shopping online.  In addition, even when RTO transactions became available through specialized e-commerce channels, such RTO options were overly cumbersome and inefficient, and only available through a limited set of online channels.

29.    The Asserted Patents explain that they are directed to addressing these problems:

> [T]he present disclosure provides consumers with the ability to enter RTO transactions at a greater variety of stores, including online retailers, and not just at a conventional RTO store. Also, various embodiments of the present disclosure make the RTO transactions more accessible to more people by eliminating the requirement that the consumer physically visit a brick and mortar RTO store or other retailer that offers such a program. In some embodiments, the present disclosure makes RTO transactions more accessible as a method of payment for online, web/Internet-based transaction.

*See, e.g.*, '682 Patent at 3:13-24.

30.    To that end, the Asserted Patents provide technological innovations that allow virtually any online retailer to offer their customers the ability to buy goods on an RTO basis in an efficient, easy, and reliable manner.  This benefits consumers who need the flexibility of RTO terms to obtain expensive goods that would otherwise be unaffordable to them, and it also benefits online retailers by allowing them to convert sales that they would otherwise miss.  *See, e.g.*, '682 Patent at 23:1-6 ("Among the benefits associated with the current disclosure are: easy online access to an RTO program; a consumer does not have to go to an RTO store making RTO accessible to more people; freedom of choice because a consumer has access to name-brand products at major retailers and is not limited to RTO store products."), 23:7-10 (Additional "benefits … [include] increased sales for retailers and e-tailers from consumers with no cash or credit but with access to [the] web-based RTO program.").

31.    In one aspect, the Asserted Patents disclose and claim systems and methods that integrate an RTO plug-in into a third-party e-commerce website.  The plug-in is executed to present an RTO payment option in a checkout user interface of an e-commerce website.  This is shown and described in connection with, for example, FIGS. 34 and 37 of the '682 Patent:



**FIG. 34**



**FIG. 37**

32.      As shown in the figures above, the "FlexShopper" RTO payment option is integrated into the e-commerce user interface  itself ("Electronics Superstore"), for example, at a checkout or payment initiation page (*e.g.*, checkout page for "Electronics Superstore").

33.      The RTO payment option is selectable by a consumer on an interface of the e-commerce website to initiate an online RTO transaction with an RTO management software application as payment for goods selected by the consumer.  After selection of the RTO payment option, one or more RTO user interfaces received from an RTO management application may be presented to the consumer through the e-commerce server.  FIG. 39 of the '682 Patent shows one example of such an RTO user interface provided through the e-commerce server:



**FIG. 39**

34.    The RTO user interface above prompts the consumer to apply for an account with the RTO financial services entity to facilitate the RTO transaction for the goods selected by the consumer.  In particular, the interface above combines certain visual elements of the host website (*e.g.*, "Electronics Superstore" order summary interface) with content of a third-party (*e.g.*, "FlexShopper" header, login interface, etc.).  And since the e-commerce server provides the RTO user interfaces to the consumers, the e-commerce server facilitates the RTO transaction.  This helps the e-commerce server retain control over consumers.

35.    The plug-in also provides additional RTO user interfaces through the e-commerce server that allow the consumer and e-commerce website to provide identifying information about the consumer and the goods being purchased to the RTO management system, enabling the RTO financial services entity to quickly and reliably determine whether the transaction is eligible for

RTO.  This is shown and described in connection with, for example, FIGS. 16 and 38 of the '682

Patent:



**FIG. 16**



**FIG. 38**

36.    The RTO user interfaces also enable the RTO management system to transmit to the consumer a spending limit and RTO transaction terms corresponding to the goods being purchased through the e-commerce website.  This is shown and described in connection with, for example, FIGS. 40 and 41 of the '682 Patent:



**FIG. 40**



**FIG. 41**

37.    The consumer may also use the RTO user interfaces to accept the terms of the RTO transaction and receive confirmation of payment for the goods by the RTO management application, all as part of the checkout or payment initiation process of the e-commerce website. This is shown and described in connection with, for example, FIG. 42 of the '682 Patent:



**FIG. 42**

38.    The patented RTO plug-in and RTO user interfaces, among other claimed features, represent a technological solution that is necessarily rooted in computer technology in order to

16

overcome a problem specifically arising in the realm of computer networks.  In particular, the RTO plug-in provides an e-commerce server the technological ability to complete an online RTO transaction *through* its e-commerce website while retaining control of its consumer.  The patented RTO plug-in integrates with the e-commerce server's website application to integrate a selectable RTO control element in an e-commerce user interface (*e.g.*, checkout page) and also provides the e-commerce server (*e.g.*, after selection of the integrated RTO control element) one or more RTO user interfaces (*e.g.*, received from the RTO management application) to the consumer to complete an online RTO transaction *through* the e-commerce server/website.  In short, the Asserted Patents solve technological problems not faced by brick-and-mortar implementations of RTO transactions and enables e-commerce servers to offer online RTO transactions as a payment option to its consumers while retaining control of its consumers.

39.    By providing the RTO transaction user interfaces through the e-commerce website/server, the Asserted Patents improve the checkout process, and increase the percentage of completed sales for e-commerce retailers, by allowing the e-commerce server to retain more control over its consumers.  Notably, Defendants recognize and tout benefits consistent with their use of the patented technology in marketing their infringing products and services to e-commerce merchants.  *See, e.g.,* https://www.acima.com/en/ecommerce (touting a "frictionless experience" in which "customers can complete their transaction without leaving your site," with "reduce[d] checkout friction" and "quick pre-approval").

40.    These technological features are not only described in the specification, as shown above, but they are also found in the claims of the Asserted Patents.  For example, claim 1 of the '682 patent recites, in part:

**a RTO plug-in integrated with the e-commerce application to facilitate a RTO transaction through the e-commerce website**, wherein the RTO plug-in is executable by the e-commerce server to:

**integrate a RTO control element in the e-commerce user interface associated with the good**, wherein the RTO control element is selectable to acquire the good using the RTO transaction; and

after selection of the RTO control element, **provide to the consumer device**, via the network, **one or more than one RTO user interface received from the RTO management application**, **to facilitate completion of the RTO transaction through the e-commerce website**.

41.     This claim recites an RTO plug-in that is integrated with the e-commerce application to integrate an RTO control element in an e-commerce user interface associated with the good and provide the consumer (*e.g.*, after selection of the RTO control element) one or more RTO user interfaces received from the RTO management application to facilitate completion of the RTO transaction through the e-commerce website.

42.     Other claims of the Asserted Patents provide similar innovations.  As one non-limiting example, the '969 Patent recites, in part:

communicating, via a network, with an e-commerce website **to integrate a rent-to-own (RTO) payment option into a user interface of the e-commerce website**;

in response to a consumer selecting the RTO payment option, providing an interface for communicating between the consumer and an RTO management system to complete an RTO payment transaction, **the interface embedded within the e-commerce website to provide a unified transaction screen to the consumer**.

43.     Here, too, the claim specifies that the RTO payment option is integrated into the user interface of the e-commerce website and, in response to selecting the RTO payment option, the consumer is provided an interface for completing the RTO transaction that is embedded in the e-commerce website to advantageously "provide a *unified transaction screen* to the consumer."

44.     Accordingly, the claims of the Asserted Patents also reflect the aforementioned technological solution.  In particular, the claimed RTO plug-in provides an e-commerce server the technological ability to complete an online RTO transaction *through* its e-commerce website while retaining control of its consumer.  The RTO plug-in integrates with the e-commerce server's

18

website application to not only integrate a selectable RTO control element in an e-commerce user interface (*e.g.*, checkout page), but also provide the e-commerce server (*e.g.*, after selection of the integrated RTO control element) one or more RTO user interfaces (*e.g.*, received from the RTO management application) to the consumer to complete an online RTO transaction *through* the e-commerce server/website.  Accordingly, the Asserted Patents claim technological features that solve technological problems not faced by brick-and-mortar implementations of RTO transactions and enable e-commerce servers to offer online RTO transactions as a payment option to their consumers while retaining control of their consumers.

45.    As the Patent Office stated about the '682 Patent claims, as an example:

> With respect to 35 USC 101, … the claimed solution is necessarily rooted in computer technology in order to overcome a problem with computer networks because the claims recite an RTO plug-in that provides an e-commerce server the ability to complete an RTO transaction through its e-commerce website while retaining control of the customer, where the ordered combination of the elements as a whole provide for an inventive concept to the claims.

> Applicant argues that the recited RTO plug-in integrates with the e-commerce website not only to integrate a selectable RTO control element in a payment field of a checkout interface, but also provides the e-commerce server with one or more RTO interfaces upon selection of a control element, where the one or more RTO interfaces are received from the claimed RTO management application that is part of the RTO system that also comprises a website. This claim requires that the one or more RTO interfaces are received from the management application. The plug-in of the e-commerce server allows for the transaction to be completed through the e-commerce website while also receiving the one or more interfaces from the management application that is part of the RTO system that also has its own website. The claimed ordered combination of the consumer computer device, RTO system that comprises the management application and a website with a plurality of RTO interfaces, the e-commerce server with the ecommerce website and the RTO plug-in, with the claimed functionality are found to collectively provide for significantly more than the abstract idea of entering into a rent to own transaction, and provide for a practical application that provides for an inventive concept to the claims. Additionally, no evidence of record indicates that the claimed use of technology as recited in the claim as far as the use of the plug-in is concerned was something that was well understood, routine, and conventional to those in the field as of the earliest filing date of the instant application. The additional elements of the claim in combination and beyond that which define the abstract idea are not considered to be a mere instruction to apply the abstract idea using generic

computers and are not considered to be something that amounts to an insignificant extra solution activity.

Absent evidence of the additional elements in the claimed combination being well understood, routine, and conventional, which there is none of record or known to the examiner, the examiner concludes that the ordered combination of the claim as a whole provides for an inventive concept to the claims that renders them eligible.

46.     The Patent Office similarly found the claims of the other Asserted Patents eligible under 35 U.S.C. § 101.

**Defendants' Infringing Technology**

47.     Defendants are engaged in the RTO business, and they have provided and continue to provide infringing e-commerce lease-to-own solutions to third-party e-commerce entities that sell durable goods to consumers, including through their Acima e-commerce offerings.  *See, e.g.*, https://www.acima.com/en/ecommerce.[4]  Upon information and belief, these solutions include products (*e.g.*, software, website plug-ins, and/or related hardware) that Defendants provide and/or use in conjunction with third-party e-commerce websites to allow said websites to sell goods to consumers on an RTO basis.  For example, upon information and belief, Defendants make, sell, offer for sale, use, and/or import software, such as webpage "plug-ins," that are integrated into third-party e-commerce websites to allow the e-commerce websites to sell their goods to consumers on an RTO basis.[5]  One non-limiting example of such a third-party e-commerce website

---

[4]  On information and belief, Defendants have also provided infringing e-commerce lease-to-own solutions through their Merchants Preferred and Preferred Lease offerings.  *See, e.g.,* Upbound 2023 Form-10K at page 14;  https://investor.rentacenter.com/news-releases/news-release-details/rent-center-completes-acquisition-merchants-preferred; https://investor.rentacenter.com/news-releases/news-release-details/rent-center-announces-new-preferred-lease-broader-service; https://www.acima.com/preferredlease.

[5]   On information and belief, www.JustWheelsDirect.com and diamondcity.biz are just two examples e-commerce websites that used and/or still use Defendants' infringing product that enables the websites to sell their products to consumers on an RTO basis.  On information and belief, there are numerous other such e-commerce websites that used and/or currently use

that used Defendants' product to integrate RTO payment options for goods in its website is shown below:



*See, e.g.*, https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:51 -- "Go to diamondcity.biz right now. Select the beautiful jewelry you want. **At checkout, choose Acima as your payment option**… Ahh yeah! You're about to own some jewelry, fast and easy, and affordable… It's that simple right? Take your jewelry now and pay later.").

48.    Defendants' use, testing, and demonstration of these products and offerings, alone or in combination with e-commerce websites, directly infringe the Asserted Patents.  Defendants also directly infringe one or more of the Asserted Patents based on their vicariously liability for the performance or use of the claimed systems and methods of the Asserted Patents by consumers and/or e-commerce entities.  Defendants are also liable for indirect infringement by inducing and contributing to the direct infringement of the Asserted Patents by third-party e-commerce entities

---

Defendants' infringing products.  *See, e.g.*, https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores."); https://www.acima.com/en/ecommerce.

and/or consumers that use Defendants' products and services to facilitate the sale and purchase of goods via e-commerce websites on an RTO basis.

49.     FlexShopper's patented technology is central to Defendants' Acima e-commerce lease-to-own products and services.  Absent their unauthorized use of FlexShopper's patented technology, this segment of Defendants' business would not exist in any recognizable form.

**FIRST CAUSE OF ACTION**
**Infringement of U.S. Patent No. 11,966,969**

50.     Plaintiff re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs as though fully set forth herein.

51.     FlexShopper is the current exclusive owner and assignee of all right, title, and interest in and to U.S. Patent No. 11,966,969 (the "'969 patent"), titled "Computer Implemented System and Method for a Rent-to-own Program," duly and legally issued by the United States Patent and Trademark Office on April 23, 2024, including the right to bring this suit for injunctive relief and damages.  A true and correct copy of the '969 patent is attached hereto as Exhibit A.

52.     The '969 patent is valid and enforceable.

53.     Defendants have infringed and continue to infringe the '969 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products (*e.g.*, software, website plug-ins, and/or related hardware) and services that perform one or more claims of the '969 patent, including in connection with enabling e-commerce websites associated with third-party e-commerce entities to sell goods to consumers on an RTO basis.

54.     As a non-limiting example, Defendants have infringed and continue to infringe claim 1 of the '969 patent.  Claim 1 recites:

> 1. A method comprising:
> communicating, via a network, with an e-commerce website to integrate a
> rent-to-own (RTO) payment option into a user interface of the e-commerce website;

in response to a consumer selecting the RTO payment option, providing an interface for communicating between the consumer and an RTO management system to complete an RTO payment transaction, the interface embedded within the e-commerce website to provide a unified transaction screen to the consumer;

receiving identifying data corresponding to an item to be purchased using the RTO payment option, the identifying data describing the item, a price of the item, a type of the item, and information regarding whether the item is transaction eligible;

receiving, through the interface for communicating with the RTO management system, identifying information of the consumer;

providing, through the interface for communicating with the RTO management system, a spending limit and RTO transaction terms corresponding to the item to be purchased using the RTO payment option, the spending limit determined particularly for the consumer and based on the identifying data of the item;

receiving, through the interface for communicating with the RTO management system, an indication of the consumer's acceptance of the RTO transaction terms; and

providing a payment confirmation to the e-commerce website for the item.

55.    Defendants have directly infringed and continue to directly infringe claim 1 of the '969 Patent by using, testing, and demonstrating products (*e.g.*, software, website plug-ins, and/or related hardware) and services that provide third-party e-commerce websites associated with third-party e-commerce entities the ability to sell goods to consumers on an RTO basis.  *See, e.g.*, https://www.acima.com/en/ecommerce ("Easy Integration. Robust API and Pre-built Shopping Cart Plugins.").  Defendants' products and services are available through a variety of well-known e-commerce platforms that are used by thousands of third-party e-commerce entities to build and operate their e-commerce websites.  *See* https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores.").  On information and belief, these e-commerce platforms include BigCommerce, Woo Commerce, Shopify, and Magento.  *See, e.g.*, https://www.acima.com/en/ecommerce.

56.    Upon information and belief, to enable the RTO payment option on third-party retail websites, Defendants, or servers owned by and/or operated on behalf of Defendants, communicate with the third-party e-commerce website over a network to integrate Defendants'

products (*e.g.*, software, website plug-in, and/or related hardware) with the third-party e-commerce website, which creates a rent-to-own (RTO) payment option in a user interface of the e-commerce website. One non-limiting example of such an RTO payment option integrated into a user interface of an e-commerce website is shown below:



*See, e.g.*, https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:51 – on information and belief, showing Acima as a payment option).

57.  Upon information and belief, in response to a consumer selecting the RTO payment option, Defendants, or servers owned by and/or operated on behalf of Defendants, provide an interface for communicating between the consumer and Defendants' RTO management system to complete the RTO payment transaction. Upon information and belief, the interface is embedded within the e-commerce website to provide a unified transaction screen to the consumer. *See, e.g.*, https://www.acima.com/en/ecommerce ("Customer never leaves your site[;] Unlike some providers, with Acima eCommerce, customers can complete their transaction without leaving your site."), *id.* ("Pre-Approval Widgets[;] Easily Integrate Acima's marketing resources on your

website to drive conversion.").  One non-limiting example of such an interface integrated within the e-commerce website is shown below:



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:40 – on information and belief, showing interface that allows consumer to send RTO management system (Acima) information on page displaying "Diamond City Jewelers").

58.    Upon information and belief, Defendants, or servers owned by and/or operated on behalf of Defendants, receive identifying data corresponding to the item being purchased using the RTO payment option, the identifying data describing the item, a price of the item, a type of the item, and information regarding whether the item is transaction eligible.  One non-limiting example of such identifying data being received is shown below:



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:32-0:34 – on information and belief, showing identifying data such as item details and type (*e.g.*, Gold Square Earrings), price (*e.g.*, $586.01), etc.).

59.    Upon information and belief, Defendants, or servers owned by and/or operated on behalf of Defendants, receive through the interface information that identifies the consumer.  A non-limiting example of an interface that allows for the receipt of identifying consumer information is shown below:



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:40 – on information and belief,
requesting consumer's phone number which can be used to identify consumer).

60.    Upon information and belief, Defendants, or servers owned by and/or operated on
behalf of Defendants, provide through the interface a spending limit and RTO transaction terms
corresponding to the item to be purchased using the RTO payment option, where the spending
limit is determined particularly for the consumer and based on the identifying data of the item.
*See, e.g.*, https://www.acima.com/en/how-it-works ("We'll provide a lease agreement of 12
months or longer for you to review and sign."); *id.* (Our application is fast and easy to complete,
and won't harm your credit. You could get approved for $300 to $5,000 of shopping power by
meeting these basic requirements: An active checking account with at least $750 of income per
month[;] 3 months of income history with your current source of income[;] Government-issued
photo ID and an SSN or Taxpayer Identification Number").

61.    Upon information and belief, Defendants, or servers owned by and/or operated on
behalf of Defendants, receive through the interface an indication of the consumer's acceptance of
the RTO transaction terms.  *See, e.g.*, https://www.acima.com/en/how-it-works ("Complete Your

Agreement[;] We'll provide a lease agreement of 12 months or longer for you to review and sign.").

62.     Upon information and belief, Defendants, or servers owned by and/or operated on behalf of Defendants, provide a payment confirmation to the e-commerce website for the item. *See, e.g.*, https://www.acima.com/en/how-it-works ("Acima will then make the purchase and lease it to you as detailed in your agreement.").

63.     Defendants have had actual knowledge of the '969 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint.  Moreover, on information and belief, Defendants have had actual knowledge of the '969 Patent and details of Defendants' infringement thereof since the '969 Patent issued on April 23, 2024.  Defendants have known about FlexShopper's patent portfolio, which includes parent applications and parent patents to the '969 Patent, since approximately September 2022, when FlexShopper and a senior corporate officer of Defendants had a meeting in which they discussed, among other things, FlexShopper's patent portfolio.  Defendants have also known about the '778 Patent, which is part of the same family as the '969 Patent, since at least Oct. 5, 2021, when the '778 Patent was cited as prior art in an office action against one of Defendants' pending patent applications.  On information and belief, these facts support the conclusion that Defendants monitored the prosecution histories of FlexShopper's patent applications, including U.S. Patent Application No. 17/929,411, which ultimately issued as the '969 Patent, and that Defendants have known about the '969 Patent and details of Defendants' infringement thereof since on or about the day it issued (April 23, 2024).

64.     Notwithstanding Defendants' actual knowledge of the '969 Patent and their infringement, Defendants continued to infringe claim 1 of the '969 Patent by using, testing, and demonstrating their products (*e.g.*, software, website plug-ins, and/or related hardware) and

services that provide third-party retail websites associated with the third party-ecommerce entities the ability to sell their goods to consumers on an RTO basis.

65.    Defendants are also liable for indirect infringement under 35 U.S.C. § 271(b) for actively and knowingly inducing the third-party e-commerce entities Defendants partner with to directly infringe the '969 Patent.  For example, Defendants supplied and continue to supply third-party e-commerce entities with their infringing products that the third party-ecommerce entities install on their websites and use to sell goods to consumers on an RTO basis.[6]  On information and belief, those third party-commerce entities practice, for example, claim 1 of the '969 Patent when installing and using Defendants' RTO products.

66.    For instance, on information and belief, a third-party e-commerce entity communicates, via a network, with its e-commerce website to integrate an RTO payment option into a user interface of the e-commerce website when installing Defendants product.  Once installed, Defendants' product: provides an interface for communicating between the consumer/end user of the e-commerce website and an RTO management system to complete the RTO payment transaction, where the interface is embedded within the e-commerce website to provide a unified transaction screen to the consumer; receives identifying data corresponding to the item being purchased using the RTO payment option, the identifying data describing the item, a price of the item, a type of the item, and information regarding whether the item is transaction eligible; receives through the interface information that identifies the consumer; provides through

---

[6]    On information and belief, www.JustWheelsDirect.com and diamondcity.biz are just two examples e-commerce websites that used and/or still use Defendants' infringing product that enables the websites to sell their products to consumers on an RTO basis.  On information and belief, there are numerous other such e-commerce websites that used and/or currently use Defendants' infringing products.  *See, e.g.*, https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores."); https://www.acima.com/en/ecommerce.

the interface a spending limit and RTO transaction terms corresponding to the item to be purchased using the RTO payment option, where the spending limit determined particularly for the consumer and based on the identifying data of the item; receives through the interface an indication of the consumer's acceptance of the RTO transaction terms; and provides a payment confirmation to the e-commerce website for the item. *See supra*, ¶¶56-62.

67.    Defendants also actively encouraged and facilitated the third-party e-commerce entities to install and use Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) in an infringing manner, including through advertising/publications, technical support, and other means. *See, e.g.*, https://www.acima.com/en/ecommerce (providing documentation to e-commerce entities interested in learning about Defendants' infringing products and how to integrate them into their e-commerce websites); *id.* ("From the very start, we are dedicated to providing you with the education, transparency, and resources you will need to succeed with Acima."). These deliberate and intentional acts led and continue to lead the third-party e-commerce entities to directly infringe the '969 Patent.

68.    On information and belief, Defendants knew and intended their actions to induce the third-party e-commerce entities' direct infringement. For example, Defendants' products were specifically designed to perform the steps described above (*see supra*, ¶¶56-62) that infringe the '969 Patent. Defendants also have had actual knowledge of the '969 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as the date the '969 Patent issued. *See supra*, ¶63.

69.    Defendants are also liable for indirect infringement under 35 U.S.C. § 271(c) for contributing to the infringement of the '969 Patent by the third-party e-commerce entities they partner with. Specifically, Defendants provide their products (software, website "plug-ins," and/or

related hardware) that are installed and used by the third-party e-commerce entities to infringe, for example, claim 1 of the '969 Patent. *See supra*, ¶65. They are also a material part of the claimed invention as their use provides e-commerce websites associated with the third party-ecommerce entities the ability to sell their goods to consumers on an RTO basis. *Id.* Defendants also knew that providing their products to the third-party e-commerce entities would contribute to their direct infringement and also knew that their products were especially made or adapted for use in a manner that infringe the '969 Patent when they provided the products to the third-party e-commerce entities because the products are specifically designed to integrate into e-commerce websites and provide RTO transaction functionality.

70.     Defendants also had actual knowledge of the '969 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as the date the '969 Patent issued. *See supra*, ¶63. Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) are not staple articles of commerce capable of any substantial non-infringing use. Indeed, their only use is to provide e-commerce websites associated with the third party-ecommerce entities the ability to sell their goods to consumers on an RTO basis in an infringing manner. *See supra*, ¶66.

71.     Defendants are not and have never been licensed or otherwise authorized by FlexShopper to practice the claims of the '969 Patent.

72.     By reason of Defendants' infringing activities, FlexShopper has suffered substantial damages, and will continue to suffer substantial damages, in an amount to be proven at trial. But for Defendants' infringement of the '969 Patent, FlexShopper would have provided third-party e-commerce entities with the patented FlexShopper technology that they needed to facilitate the sale of goods on an RTO basis to consumers and/or licensed the '969 Patent to

31

Defendants so that Defendants could implement products and services to facilitate the sale of goods on an RTO basis to consumers via third-party e-commerce websites. As a result of Defendants' infringement, FlexShopper has been damaged in an amount equal to the loss of profits that would otherwise have accrued to FlexShopper from providing its patented technology to third-party e-commerce entities, including leasing revenues and fees paid by consumers for goods purchased from such third-party e-commerce websites on an RTO basis, but in no event less than a reasonable royalty.

73.    Defendants' continuing acts of infringement are a basis of consumer demand for the infringing products and services. Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to FlexShopper, for which FlexShopper has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court. The hardships that an injunction would impose are less than those faced by FlexShopper should an injunction not issue. The public interest would be served by issuance of an injunction.

74.    Defendants' direct and indirect infringement of the '969 patent has been willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284.

## SECOND CAUSE OF ACTION
### Infringement of U.S. Patent No. 12,067,611

75.    Plaintiff re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs as though fully set forth herein.

76.    FlexShopper is the current exclusive owner and assignee of all right, title, and interest in and to U.S. Patent No. 12,067,611 (the "'611 patent"), titled "Computer Implemented System and Method for a Rent-to-own Program," duly and legally issued by the United States Patent and Trademark Office on August 20, 2024, including the right to bring this suit for

injunctive relief and damages.  A true and correct copy of the '611 patent is attached hereto as Exhibit B.

77.    The '611 patent is valid and enforceable.

78.    Defendants have infringed and continue to infringe the '611 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products (*e.g.*, software, website plug-ins, and/or related hardware) and services that perform one or more claims of the '611 patent, including in connection with enabling e-commerce websites associated with third-party e-commerce entities to sell goods to consumers on an RTO basis.

79.    As a non-limiting example, Defendants have infringed and continue to infringe claim 16 of the '611 patent.  Claim 16 recites:

16. A method, comprising:

providing, by an e-commerce server including an e-commerce application via a network, an e-commerce website to a consumer device, the e-commerce website comprising a plurality of e-commerce user interfaces including an e-commerce user interface associated with a good, wherein the e-commerce user interface associated with the good includes identifying data corresponding to the good, the e-commerce server further including a rent-to-own (RTO) plug-in integrated with the e-commerce application to facilitate a RTO transaction through the e-commerce website, the RTO plug-in executable by the e-commerce server to integrate a RTO control element in the e-commerce user interface associated with the good, wherein the RTO control element is selectable to acquire the good using the RTO transaction; and

after selection of the RTO control element, receiving from a RTO system comprising a computer processor and a RTO management application, via the RTO plug-in, a plurality of RTO user interfaces including one or more than one RTO user interface for provision to the consumer device, via the network, to facilitate completion of the RTO transaction through the e-commerce website, the one or more than one RTO user interface:

providing the identifying data corresponding to the good selected for acquisition to the RTO system, the identifying data describing the good, a price of the good, and a type of the good,

receiving an indication that the good is transaction-eligible,

receiving one or more inputs via one of the one or more than one RTO user interface, the one or more inputs providing identifying information of a consumer, and

transmit the identifying information to the RTO system, and

> providing a spending limit and RTO transaction terms via the one or
> more than one RTO user interface in response to a signal received from the
> RTO system, wherein the spending limit and RTO transaction terms are
> determined based on the consumer and the good selected for acquisition.

80.    Defendants partner with various third-party e-commerce entities by providing them products (*e.g.*, software, website plug-ins, and/or related hardware) and services that enable the e-commerce entities to sell goods to consumers on an RTO basis on their e-commerce websites.  *See, e.g.*, https://www.acima.com/en/ecommerce ("Easy Integration. Robust API and Pre-built Shopping Cart Plugins.").  Defendants' products and services are available through a variety of well-known e-commerce platforms that are used by thousands of third-party e-commerce entities to build and operate their e-commerce websites.  *See* https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores.").  On information and belief, these e-commerce platforms include BigCommerce, Woo Commerce, Shopify, and Magento.  *See, e.g.*, https://www.acima.com/en/ecommerce.  By installing and using these products, the third-party e-commerce entities perform each of the claimed steps of, for example, claim 16 and hence directly infringe the '611 Patent, as shown below.[7]

81.    Upon information and belief, when a third-party e-commerce entity installs and uses Defendants' products, the third-party e-commerce entity's e-commerce server having an e-commerce application provides to a consumer device, via a network, an e-commerce website that includes a plurality of e-commerce user interfaces.  At least one of those e-commerce user interfaces is associated with a good and includes identifying data corresponding to the good,

---

[7]    On information and belief, www.JustWheelsDirect.com and diamondcity.biz are just two examples e-commerce websites that used and/or still use Defendants' infringing product that enables the websites to sell their products to consumers on an RTO basis.  On information and belief, there are numerous other such e-commerce websites that used and/or currently use Defendants' infringing products.  *See, e.g.*, https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores."); https://www.acima.com/en/ecommerce.

including data describing the good, the price of the good, and the type of good.  One non-limiting

example of such an e-commerce website is shown below:



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:32 – on information and belief,

showing e-commerce website with user interface depicting description, type, and price of good).

82.    Upon information and belief, when the third-party e-commerce entity installs and

uses Defendants' products, the third-party e-commerce entity's e-commerce server further

includes an RTO plug-in integrated with the e-commerce application to facilitate a RTO

transaction through the e-commerce website.  *See, e.g.*, https://www.acima.com/en/ecommerce

("Easy Integration[;] Robust API and Pre-Built Shopping Cart Plug-ins").  The RTO plug-in is

executable by the e-commerce server to integrate an RTO control element in the e-commerce user

interface associated with the good, and the RTO control element is selectable to acquire the good

using the RTO transaction.  *Id.* ("Customer never leaves your site[;] Unlike some providers, with

Acima eCommerce, customers can complete their transaction without leaving your site."), *id.*

("Pre-Approval Widgets[;] Easily Integrate Acima's marketing resources on your website to drive

conversion.").  One non-limiting example of such an e-ecommerce application is shown below:



*See, e.g.*, https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:51 – showing, on information and belief, an RTO plug-in integrated with an e-commerce application that executes to integrate the selectable RTO control element with the e-commerce user interface to acquire the good using an RTO transaction).

83.    Upon information and belief, after the RTO control element is selected, the e-commerce server receives from an RTO system comprising a computer processor and an RTO management application, via the RTO plug-in, a plurality of RTO user interfaces including one or more RTO user interfaces for provision to the consumer device, via the network.  The RTO user interface(s) facilitate completion of the RTO transaction through the e-commerce website.  These RTO user interfaces provide identifying information corresponding to the good selected for acquisition to the RTO system; receive an indication that the good is transaction-eligible; receive identifying information about the consumer and transmit it to the RTO system; and provide a spending limit and RTO transaction terms based on the consumer and the good selected for acquisition.  *See, e.g.*, https://www.acima.com/en/how-it-works ("We'll provide a lease agreement of 12 months or longer for you to review and sign."); *id.* (Our application is fast and easy to

complete, and won't harm your credit. You could get approved for $300 to $5,000 of shopping power by meeting these basic requirements: An active checking account with at least $750 of income per month[;] 3 months of income history with your current source of income[;] Government-issued photo ID and an SSN or Taxpayer Identification Number"). Non-limiting examples below depict one or more such RTO user interfaces:



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:32-0:34 – on information and belief, RTO user interface providing identifying data about to good selected including description, type, and price).



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:40 – on information and belief, RTO interface receiving inputs that provides consumer identifying information and transmitting the information to the RTO system).

84.     While the third-party e-commerce entities have infringed and continue to directly infringe the '611 Patent, Defendants, too, have infringed and continue to directly infringe claim 16 of the '611 Patent under 35 U.S.C. § 271(a) because the steps of this patented process performed by third-party e-commerce entities are attributable to Defendants.  Defendants direct and control the third-party e-commerce entities to carry out the patented process.  Defendants condition a third-party e-commerce entity's ability to sell goods to consumers on an RTO basis—and all the benefits that flow to the third-party e-commerce entity based on such RTO sales—upon the third-party e-commerce entity's performance of the patented process.  Defendants also establish the manner or timing of that performance.  Defendants also form a joint enterprise with each third-party e-commerce entity that Defendants partner with to sell goods to consumers on an RTO basis through the e-commerce entity's website.

85.    On information and belief Defendants direct and control the third-party e-commerce entity to perform the steps of claim 16 of the '611 Patent by conditioning the benefit of being able to sell goods to consumers on the basis of an RTO transaction on the third-party e-commerce entity's performance of the claimed steps.  For example, on information and belief, the RTO plug-in that Defendants provide to the third-party e-commerce entity needs to be integrated with the e-commerce application and needs to be executed by an e-commerce server to integrate a selectable RTO control element in an e-commerce user interface provided to the consumer to facilitate and complete the RTO transaction.  Without the e-commerce entity providing the e-commerce server, e-commerce application, e-commerce website, and user interfaces and performing the claimed steps associated with these components, Defendants do not confer the benefit of their RTO plug-in and other software/hardware to enable the e-commerce entity's website to sell goods on an RTO basis.  Defendants also establish the manner and/or timing of the third-party e-commerce entity's performance of these claimed steps—*e.g.*, the e-commerce entity needs to provide an e-commerce website application that provides an e-commerce website having an e-commerce user interface for the consumer, otherwise Defendants' RTO plug-in cannot integrate the RTO control element in the e-commerce user interface.

86.    On information and belief, Defendants also form a joint enterprise with each third-party e-commerce entity that Defendants partner with to sell goods to consumers on an RTO basis through the e-commerce entity's website.  As such, Defendants can be charged with the acts of the third-party e-commerce entities, which practice all of the steps of claim 16.

87.    On information and belief, Defendants and the third-party e-commerce entities have an express or implied agreement to create an e-commerce website that is capable of selling goods to consumers on an RTO basis and practices the steps of claim 16.  Defendants and the third-

party e-commerce entities have a common purpose to create an e-commerce website that is capable of selling goods to consumers on an RTO basis.  Defendants and the third-party e-commerce entities have a community of pecuniary interest in that purpose as both Defendants and third-party e-commerce entities will profit financially from selling goods to consumers on an RTO basis.  On information and belief, Defendants and the third-party e-commerce entities have an equal right to a voice in the direction of the enterprise.  For example, on information and belief, either the Defendants or third-party e-commerce entities can choose to terminate their relationship and end selling the third-party e-commerce entities' goods to consumers on an RTO basis.

88.    Upon information and belief, Defendants also directly infringe claim 16 of the '611 Patent under 35 U.S.C. § 271(a) by testing and demonstrating their products (*e.g.*, software, website plug-ins, and related hardware) to show potential customers/partners how Defendants' products enable e-commerce websites to integrate RTO payment options and allow the websites to sell goods to consumers on an RTO basis.  For example, upon information and belief, Defendants make, own, and/or operate their own e-commerce servers, e-commerce applications, and e-commerce websites, which are then used by Defendants to integrate their RTO products to determine whether the RTO products are functioning correctly and reliably.  Upon information and belief, upon installing their products onto their own e-commerce servers/applications/websites, Defendants execute their RTO products and perform the patented process of claim 16 of the '611 Patent to verify satisfactory operation of their products.

89.    Defendants have had actual knowledge of the '611 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint.  Moreover, on information and belief, Defendants have had actual knowledge of the '611 Patent and details of Defendants' infringement thereof since the '611 Patent issued on August 20, 2024.  Defendants

have known about FlexShopper's patent portfolio, which includes parent applications and parent patents to the '611 Patent, since approximately September 2022, when FlexShopper and a senior corporate officer of Defendants had a meeting in which they discussed, among other things, FlexShopper's patent portfolio.  Defendants have also known about the '778 Patent, which is part of the same family as the '611 Patent, since at least Oct. 5, 2021, when the '778 Patent was cited as prior art in an office action against one of Defendants' pending patent applications.   On information and belief, these facts support the conclusion that Defendants monitored the prosecution histories of FlexShopper's patent applications, including U.S. Patent Application No. 17/099,079, which ultimately issued as the '611 Patent, and that Defendants have known about the '611 Patent and details of Defendants' infringement thereof since on or about the day it issued (August 20, 2024).  Notwithstanding Defendants' actual knowledge of the '611 Patent and their infringement, Defendants continued to infringe claim 16 of the '611 Patent.

90.    As explained above, Defendants' third-party e-commerce customers/partners directly infringe the '611 Patent.  *See supra*, ¶¶81-83.  Defendants actively and knowingly induced and continue to induce their customers'/partners' direct infringement and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(b).  For example, Defendants supplied and continue to supply their customers/partners with products (*e.g.*, software, website plug-ins, and/or related hardware) that when executed/used by the third-party e-commerce entities, or computers/servers owned by and/or operated on behalf of the third-party e-commerce entities, perform the steps of the patented process of claim 16 of the '611 Patent, including, for example, integrating an RTO control element with the e-commerce user interface and receiving a plurality of RTO user interfaces that perform the various steps recited in claim 16.  *See supra*, ¶¶81-83.

91.    Defendants also actively encouraged and facilitated their customers/partners to install and use Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) in an infringing manner, including through advertising/publications, technical support, and other means.  *See, e.g.*, https://www.acima.com/en/ecommerce (providing documentation to e-commerce entities interested in learning about Defendants' infringing products and how to integrate them into their e-commerce websites); *id.* ("From the very start, we are dedicated to providing you with the education, transparency, and resources you will need to succeed with Acima.").  These deliberate and intentional acts led and continue to lead the third-party e-commerce entities to directly infringe the '611 Patent.

92.    On information and belief, Defendants knew and intended their actions to induce the third-party e-commerce entities' direct infringement.  For example, Defendants' products were specifically designed to cause the third-party e-commerce entities' servers and e-commerce applications to perform certain steps of the patented process described above. *See supra*, ¶¶81-83. Defendants also have had actual knowledge of the '611 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as the date the '611 Patent issued.  *See supra*, ¶89.

93.    Defendants have also contributed to and continue to contribute to their customers'/partners' direct infringement of the '611 Patent and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(c).  Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) are components for use in practicing the patented process of the '611 Patent.  *See supra*, ¶90.  They are also a material part of the claimed invention as their use provides e-commerce websites associated with the third party-ecommerce entities the ability to sell their goods to consumers on an RTO basis.  *Id.*  As just one example, Defendants' products

are used by the third-party e-commerce retailers to integrate an RTO control element with the e-commerce websites' user interfaces and receive a plurality of RTO user interfaces that perform the various steps recited in claim 16.  Defendants also knew that providing their products to the third-party e-commerce entities would contribute to their direct infringement and also knew that their products were especially made or adapted for use in a manner that infringes the '611 Patent when they provided the products to the third-party e-commerce entities because the products are specifically designed to integrate into e-commerce websites and provide RTO transaction functionality.  *See supra*, ¶92.

94.     Defendants also have had actual knowledge of the '611 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as the date the '611 Patent issued.  *See supra*, ¶89.  Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) are not staple articles of commerce capable of any substantial non-infringing use.  Indeed, their only use is to provide e-commerce websites associated with the third party-ecommerce entities the ability to sell their goods to consumers on an RTO basis in an infringing manner.  *See supra*, ¶90.

95.     Defendants are not and have never been licensed or otherwise authorized by FlexShopper to practice the claims of the '611 Patent.

96.     By reason of Defendants' infringing activities, FlexShopper has suffered substantial damages, and will continue to suffer substantial damages, in an amount to be proven at trial.  But for Defendants' infringement of the '611 Patent, FlexShopper would have provided third-party e-commerce entities with the patented FlexShopper technology that they needed to facilitate the sale of goods on an RTO basis to consumers and/or licensed the '611 Patent to

Defendants so that Defendants could implement products and services to facilitate the sale of goods on an RTO basis to consumers via third-party e-commerce websites.

97.     As a result of Defendants' infringement, FlexShopper has been damaged in an amount equal to the loss of profits that would otherwise have accrued to FlexShopper from providing its patented technology to third-party e-commerce entities, including leasing revenues and fees paid by consumers for goods purchased from such third-party e-commerce websites on an RTO basis, but in no event less than a reasonable royalty.

98.     Defendants' continuing acts of infringement are a basis of consumer demand for the infringing products and services.  Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to FlexShopper, for which FlexShopper has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.  The hardships that an injunction would impose are less than those faced by FlexShopper should an injunction not issue. The public interest would be served by issuance of an injunction.

99.     Defendants' direct and indirect infringement of the '611 patent has been willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284.

### THIRD CAUSE OF ACTION
### Infringement of U.S. Patent No. 10,089,682

100.     Plaintiff re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs as though fully set forth herein.

101.     FlexShopper is the current exclusive owner and assignee of all right, title, and interest in and to U.S. Patent No. 10,089,682 (the "'682 patent"), titled "Computer Implemented System and Method for a Rent-to-own Program," duly and legally issued by the United States Patent and Trademark Office on October 18, 2018, including the right to bring this suit for

injunctive relief and damages.  A true and correct copy of the '682 patent is attached hereto as Exhibit C.

102.    The '682 patent is valid and enforceable.

103.    Defendants have infringed and continue to infringe the '682 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products (*e.g.*, software, website plug-ins, and/or related hardware) and systems that include such products that practice the claims of the '682 patent, including in connection with enabling e-commerce websites associated with third-party e-commerce entities to sell goods to consumers on an RTO basis.

104.    As a non-limiting example, Defendants have infringed and continue to infringe claim 1 of the '682 patent.  Claim 1 recites:

> 1. A system, comprising:
> a consumer computer device;
> a rent-to-own (RTO) system comprising at least one RTO computer device and a RTO management application, wherein the RTO management application is programmed to provide a RTO website comprising a plurality of RTO user interfaces; and
> an e-commerce server in communication with the consumer computer device, wherein the e-commerce server comprises:
>> an e-commerce website application programmed to provide an e-commerce website comprising a plurality of e-commerce user interfaces, including a checkout interface, to the consumer computer device; and
>> a RTO plug-in integrated with the e-commerce website application, wherein the RTO plug-in is executable by the e-commerce server to complete an online RTO transaction through the e-commerce website by:
>>> integrating, via the RTO plug-in, a selectable RTO control element in a payment option field of the checkout interface provided to the consumer computer device, wherein the RTO control element is selectable by the consumer to initiate the online RTO transaction as a payment option; and
>>> after selection of the integrated RTO control element by the consumer, providing, via the RTO plug-in, one or more than one RTO user interface received from the RTO management application, to the consumer computer device;
> wherein the RTO management application is further programmed to:

> receive from the consumer computer device, via the RTO plug-in, input data describing the consumer;
>
> based on the input data, determine a spending limit for the consumer;
>
> receive from the consumer computer device, via the RTO plug-in, an indication of a good selected by the consumer on the e-commerce website;
>
> receive data describing the good, wherein the data describing the good comprises a price of the good and a type of the good;
>
> based on the data describing the good, determine that the good is transaction eligible;
>
> transmit to the consumer computer device, via the RTO plug-in, an indication of terms of the online RTO transaction, wherein the terms indicate a periodic payment due under the online RTO transaction; and
>
> receive from the consumer computer device, via the RTO plug-in, an acceptance of the terms; and
>
> wherein the e-commerce website application is further programmed to, after the acceptance of the terms, provide a transaction confirmation interface to the consumer computer device which indicates the online RTO transaction as complete.

105.    Upon information and belief, Defendants have directly infringed and continue to directly infringe claim 1 of the '682 Patent under 35 U.S.C. § 271(a) by making and using the claimed system when testing and demonstrating their products (*e.g.*, software, website plug-ins, and related hardware) to show potential consumers and third-party e-commerce entities how Defendants' products enable e-commerce websites to integrate RTO payment options and enable consumers to purchase goods from such websites on an RTO basis.  For example, upon information and belief, Defendants make, own, and/or operate their own consumer computer devices, e-commerce servers, e-commerce applications, and e-commerce websites, which are then used by Defendants to integrate their RTO products to confirm that their RTO products are functioning correctly and reliably.  Upon information and belief, upon installing their products onto their own e-commerce servers/applications/websites, Defendants use their consumer computer devices to communicate with such e-commerce servers/applications/websites to simulate acquiring goods on

an RTO basis to confirm proper functioning of their RTO products (*e.g.*, software, website plug-ins, and related hardware).

106.    Upon information and belief, Defendants also separately have directly infringed and continue to directly infringe claim 1 of the '682 Patent under 35 U.S.C. § 271(a) at least because they make the claimed system unrelated to any product testing.  Specifically, on information and belief, Defendants make the portion of the claimed system corresponding to the "rent-to-own (RTO) system comprising at least one RTO computer device and a RTO management application" and the "RTO plug-in."  On information and belief, Defendants are also vicariously liable for the consumer's making of the portion of the claimed system corresponding to the "consumer computer device," and the third-party e-commerce entity's making of the portion of the claimed system corresponding to the "e-commerce server" comprising "an e-commerce website application."

107.    As to the RTO system, on information and belief, Defendants own, operate, manage, or have operated/managed on their behalf, computers/servers that include an RTO management application.  These computers/servers and the RTO management application constitute an RTO system.  The RTO management application provides an RTO website that comprises a plurality of RTO user interfaces.  These system components enable Defendants to review and approve consumer requests to acquire goods from the third-party e-commerce entities on an RTO basis.  *See, e.g.*, *id.* ("Quick pre-approval[;] After completing our brief online application, customers receive a decision within seconds with their amount prior to shopping."); https://www.acima.com/en ("With Acima Leasing, our flexible, lease-to-own solutions can help you take home a new sofa, TV, mattress, mobile phone, tires and more."); *id.* ("Acima will purchase products up to your lease line amount for lease to you.").  To that end, on information

and belief, the RTO system, and more specifically the RTO management application, is programmed to: receive from the consumer computer device, via the RTO plug-in, input data describing the consumer; based on the input data, determine a spending limit for the consumer; receive from the consumer computer device, via the RTO plug-in, an indication of a good selected by the consumer on the e-commerce website; receive data describing the good, wherein the data describing the good comprises a price of the good and a type of the good; based on the data describing the good, determine that the good is transaction eligible; transmit to the consumer computer device, via the RTO plug-in, an indication of terms of the online RTO transaction, wherein the terms indicate a periodic payment due under the online RTO transaction; and receive from the consumer computer device, via the RTO plug-in, an acceptance of the terms. *See supra*, ¶¶56-62, 81-83.

108.    Defendants also make and provide the claimed RTO plug-in to third-party e-commerce entities to enable the e-commerce entities' websites to complete online RTO transactions. *See, e.g.*, https://www.acima.com/en/ecommerce ("Our eCommerce lease-to-own solution empowers customers to shop for the items they want, all without using credit.* The results are in – on average, retailers that use Acima's eCommerce experience: Less cart abandonment; Up to 30% more sales; Up to 2x ticket size; Higher approval rates"). The RTO plug-in is executable by an e-commerce server to integrate a selectable RTO control element in a payment option field of a checkout interface provided to the consumer computer device. *Id.* ("Easy Integration Robust API and Pre-built Shopping Cart Plugins"); *id.* ("Customer never leaves your site[;] Unlike some providers, with Acima eCommerce, customers can complete their transaction without leaving your site."). The RTO plug-in is also configured to provide one or more RTO user interfaces received

from the RTO management application to the consumer computer device after the RTO control element has been selected.  *See supra*, ¶¶56-62, 81-83, 107.

109.    While the consumer makes/provides the portion of the claimed system corresponding to the "consumer computer device," Defendants are vicariously liable for such making/providing.  Defendants direct and control the consumer to provide the consumer computer device to the claimed system at least by conditioning the benefit of purchasing the goods on an RTO basis on such making/providing by the consumer.  For example, without the consumer computer device, Defendants cannot receive identifying data about the consumer or the goods selected for acquisition by the consumer and, consequently, will deny the consumer's requested RTO transaction.  Defendants also establish the manner and/or timing of the consumers' provision of the consumer computer device—*e.g.*, the consumer computer device supplies the identifying information about the consumer prior to the RTO management application determining a spending limit for the consumer, and the consumer computer device supplies the indication of the good selected prior to the RTO management application determining that the good is transaction eligible.  *See, e.g.*, https://www.acima.com/en/how-it-works (Our application is fast and easy to complete, and won't harm your credit. You could get approved for $300 to $5,000 of shopping power by meeting these basic requirements: An active checking account with at least $750 of income per month[;] 3 months of income history with your current source of income[;] Government-issued photo ID and an SSN or Taxpayer Identification Number").

110.    Similarly, while the third-party e-commerce entity makes/provides the portion of the claimed system corresponding to the "e-commerce server" comprising "an e-commerce website application," Defendants are vicariously liable for such making/providing.  Defendants direct and control the third-party e-commerce entity to provide the e-commerce server having the

e-commerce website application at least by conditioning the benefit to the e-commerce entity of being able to sell goods to consumers on the basis of an RTO transaction on the third-party e-commerce entity's provision of these system components.  For example, on information and belief, the RTO plug-in that Defendants provide to the third-party e-commerce entity needs to be integrated with the e-commerce website application and needs to be executed by an e-commerce server to integrate a selectable RTO control element in a payment option field of a checkout interface provided to the consumer to facilitate and complete the RTO transaction.  *See, e.g.*, https://www.acima.com/en/ecommerce ("Customer never leaves your site[;] Unlike some providers, with Acima eCommerce, customers can complete their transaction without leaving your site."), *id.* ("Pre-Approval Widgets[;] Easily Integrate Acima's marketing resources on your website to drive conversion."); *see also* https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:51 – on information and belief, showing Acima as a payment option at checkout page). Without the e-commerce entity making/providing these system components, Defendants do not confer the benefit of their RTO plug-in and other software/hardware to enable the e-commerce entity's website to sell goods on an RTO basis.  Defendants also establish the manner and/or timing of the third-party e-commerce entity's provision of these e-commerce entity system components— *e.g.*, the e-commerce entity needs to provide an e-commerce website application that provides an e-commerce website having a check-out interface, otherwise Defendants' RTO plug-in cannot integrate the RTO control element in a payment option field of the checkout interface.

111.    Defendants are also vicariously liable for the third-party e-commerce entity making/providing the portion of the claimed system corresponding to the "e-commerce server" comprising "an e-commerce website application" because, on information and belief, the Defendants and the third-party e-commerce entity form a joint enterprise.  On information and

belief, Defendants and the third-party e-commerce entities have an express or implied agreement to create a system that is capable of selling goods to the consumer on an RTO basis—said system infringing claim 1 of the '682 Patent. Defendants and the third-party e-commerce entity have a common purpose to create the claimed system that is capable of selling goods to the consumers on an RTO basis. Defendants and the third-party e-commerce entity have a community of pecuniary interest in that purpose as Defendants and the third-party e-commerce entity will derive a tangible benefit from being able to sell goods on an RTO basis—*e.g.*, the e-commerce entity and Defendants will be able to make money on leasing payments and complete a sale that they otherwise would not have. On information and belief, Defendants and the third-party e-commerce entity have an equal right to a voice in the direction of the enterprise. For example, on information and belief, any one of these parties may decide to not move forward with the sale of the good based on an RTO transaction using the e-commerce website.

112. Defendants partner with various third-party e-commerce entities by providing them products (*e.g.*, software, website plug-ins, and/or related hardware) that enable the e-commerce entities to sell goods to consumers on an RTO basis on their e-commerce websites. *See, e.g.*, https://www.acima.com/en/ecommerce ("Easy Integration. Robust API and Pre-built Shopping Cart Plugins.").[8] Consumers use their consumer computer devices to communicate and interact with these third-party e-commerce websites, the latter having been modified by Defendants' RTO products to enable RTO transactions, to purchase goods from the e-commerce websites on an RTO

---

[8]    On information and belief, www.JustWheelsDirect.com and diamondcity.biz are just two examples e-commerce websites that used and/or still use Defendants' infringing product that enables the websites to sell their products to consumers on an RTO basis. On information and belief, there are numerous other such e-commerce websites that used and/or currently use Defendants' infringing products. *See, e.g.*, https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores."); https://www.acima.com/en/ecommerce.

basis.  In the process, the consumers use the claimed system of claim 1 of the '682 Patent and are direct infringers under 35 U.S.C. § 271(a).

113.    Even if certain aspects of the claimed system are not owned by a consumer, their use of the claimed system makes them a direct infringer of the '682 Patent.  In particular, the consumer puts the claimed system into service by controlling the system as a whole and obtaining benefit from it.  For example, the consumer, on information and belief, using their consumer computer device, communicates with an e-commerce server with the desire of purchasing goods on an RTO basis.  More specifically, the consumer communicates with an e-commerce website provided by an e-commerce website application that runs on the e-commerce server.  The e-commerce website includes a plurality of e-commerce user interfaces, including a checkout interface, associated with goods the consumer wishes to acquire on an RTO basis.  One non-limiting example of such a website accessible to the consumer using their consumer computer device is shown below:



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:32).



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:34).



*See, e.g.*, https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:36).

114.    On information and belief, the consumer continues to control the system by selecting the RTO control element that is integrated as a payment option in the checkout interface to initiate the online RTO transaction for the goods the consumer desires.  By making this selection, the consumer causes an RTO plug-in integrated with the e-commerce website application to

provide to the consumer computer device one or more RTO user interfaces from the RTO management application.  The consumer provides, using its consumer computer device, input data describing the consumer into, for example, one of the RTO user interfaces.  By doing so, the consumer causes the RTO management application to determine, based on the input data, a spending limit for the consumer.  The consumer further provides, using its consumer computer device, an indication of the good selected by the consumer on the e-commerce website and data describing the good, such as the price and type of the good.  By doing so, the consumer causes the RTO management application to determine, based on the data describing the good, that the good is transaction eligible and to transmit to the consumer computer device an indication of terms of the online RTO transaction, where the terms indicate a periodic payment due under the online RTO transaction.  The consumer further provides, using its consumer computer device, an acceptance of the terms.  By doing so, the consumer causes the e-commerce website application to provide a transaction confirmation interface to the consumer computer device that indicates the online RTO transaction is complete.  *See, e.g.*, https://www.acima.com/en/how-it-works ("We'll provide a lease agreement of 12 months or longer for you to review and sign."); *id.* (Our application is fast and easy to complete, and won't harm your credit. You could get approved for $300 to $5,000 of shopping power by meeting these basic requirements: An active checking account with at least $750 of income per month[;] 3 months of income history with your current source of income[;] Government-issued photo ID and an SSN or Taxpayer Identification Number"); *id.* ("Acima will then make the purchase and lease it to you as detailed in your agreement."); *see also supra*, ¶¶56-62, 81-83.

115.    The consumer derives a benefit from each claimed component of the system of claim 1.  For example, the consumer benefits from the consumer computer device by

communicating with the e-commerce website to select goods for the RTO transaction. The consumer also benefits from the e-commerce server/website by selecting goods for the RTO transaction and the RTO plug-in that is integrated into the website application allows the consumer to beneficially select RTO as the payment option. The consumer additionally benefits from the RTO system and associated RTO management application because the latter enables the consumer to provide information about herself/himself and the goods to be purchased to allow the RTO management application to determine a spending limit and RTO transaction eligibility for the goods. The RTO transaction terms transmitted to the consumer also benefit the consumer by having a clear indication of the parties' obligations under the RTO transaction and the receipt of the confirmation of the completion of the RTO transaction beneficially informs the consumer that the RTO transaction is complete, and goods have been purchased.

116.    While, as explained above, the consumer is a direct infringer in their own right, Defendants have directly infringed and continue to directly infringe under 35 U.S.C. § 271(a) separately because they are vicariously liable for the customers' use of the system of claim 1. Defendants direct and control the consumer to use the claimed system of claim 1 at least by conditioning the benefit of purchasing the goods on an RTO basis on such system use by the consumer. For example, Defendants require the consumer to use the system to provide identifying data about the consumer and the goods selected for acquisition otherwise the RTO transaction would be denied. Defendants also establish the manner and/or timing of the consumers' use of the claimed system—*e.g.*, Defendants require that the consumer use the system to provide the identifying information about the consumer prior to the RTO management application determining a spending limit for the consumer, and further require that the consumer use the system to provide an indication of the good selected prior to the RTO management application determining that the

good is transaction eligible.  *See, e.g.*, https://www.acima.com/en/how-it-works (Our application is fast and easy to complete, and won't harm your credit. You could get approved for $300 to $5,000 of shopping power by meeting these basic requirements: An active checking account with at least $750 of income per month[;] 3 months of income history with your current source of income[;] Government-issued photo ID and an SSN or Taxpayer Identification Number").

117.    Defendants have had actual knowledge of the '682 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint.  Moreover, on information and belief, Defendants have had actual knowledge of the '682 Patent and details of Defendants' infringement thereof since approximately September 2022, when FlexShopper and a senior corporate officer of Defendants had a meeting in which they discussed, among other things, FlexShopper's patent portfolio.  On information and belief, Defendants have also known about the '682 Patent since at least Oct. 5, 2021 when the '778 Patent, which is a child of the '682 Patent, was cited as prior art in an office action against one of Defendants' pending patent applications.  The '778 Patent lists the '682 Patent on its front page as a parent patent to which the '778 Patent is a CIP.  On information and belief, Defendants would have reviewed the '682 Patent as part of their analysis of the '778 Patent and its prosecution history when responding to the office action.  Notwithstanding Defendants' actual knowledge of the '682 Patent and their infringement, Defendants continued to infringe claim 1 of the '682 Patent.

118.    As explained above, consumers directly infringed and continue to infringe the '682 Patent.  *See supra*, ¶¶112-115.  Defendants actively and knowingly induced and continue to induce the consumers' direct infringement and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(b).  For example, Defendants provide consumers with a list of online retailers that feature Defendants' RTO products that consumers access and use the claimed system.

*See, e.g.*, https://www.acima.com/en/marketplace.    Defendants further provide advertising, publications, technical support, and other documentation to encourage consumers to use the claimed system available at various e-commerce websites.    *See, e.g.*, https://www.acima.com/en/support (featuring FAQs about leasing (https://www.acima.com/en/support/what-is-acima), the application process (https://www.acima.com/en/support/how-to-apply), lease agreements (https://www.acima.com/en/support/lease-agreements), payment information (https://www.acima.com/en/support/payment-faqs), and service and support (https://www.acima.com/en/support/service-support-faqs)).    Defendants also feature a live chat and phone number for consumers to call to seek assistance on how to use the claimed system. *See, e.g.*, https://www.acima.com/en/support/service-support-faqs.    These deliberate and intentional acts led and continue to lead consumers to directly infringe the '682 Patent.

119.    On information and belief, Defendants knew and intended their actions to induce consumers' direct infringement.    For example, e-commerce websites featuring Defendants' products (*e.g.*, software, website-plugins, and related hardware) were specifically designed to provide RTO transactions in an infringing manner to consumers using these systems. *See supra*, ¶¶113-114.    Defendants also have had actual knowledge of the '682 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as Oct. 5, 2021. *See supra*, ¶117.

120.    Defendants have also contributed to and continue to contribute to the customers' direct infringement of the '682 Patent and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(c).    Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) make up the claimed "RTO system" and "RTO plug-in," which are

components of the claimed system.  *See supra*, ¶¶106-108.  They are also a material part of the claimed invention as their use provides consumers the ability to acquire goods from e-commerce websites on an RTO basis.  *Id.* at ¶¶113-114.  Defendants also knew that their products were especially made or adapted for use in a manner that infringe the '682 Patent when they provided the products to form the system that is used by the consumer.

121.    Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) are not staple articles of commerce capable of any substantial non-infringing use.  Indeed, their only use is to provide consumers the option of purchasing goods from e-commerce websites on an RTO basis in an infringing manner.

122.    On information and belief, Defendants also knew that providing their products to form the claimed system would contribute to the consumers' direct infringement of the '682 Patent. For example, Defendants' products were specifically designed to cause the third-party e-commerce entities' websites to enable RTO transactions and allow consumers to purchase goods from these websites on an RTO basis.  *See supra*, ¶¶106-108, 113-114.  Defendants also have had actual knowledge of the '682 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as October 5, 2021. *See supra*, ¶117.

123.    Defendants are not and have never been licensed or otherwise authorized by FlexShopper to practice the claims of the '682 Patent.

124.    By reason of Defendants' infringing activities, FlexShopper has suffered substantial damages, and will continue to suffer substantial damages, in an amount to be proven at trial.  But for Defendants' infringement of the '682 Patent, FlexShopper would have provided third-party e-commerce entities with the patented FlexShopper technology that they needed to

facilitate the sale of goods on an RTO basis to consumers and/or licensed the '682 Patent to Defendants so that Defendants could implement products and services to facilitate the sale of goods on an RTO basis to consumers via third-party e-commerce websites.  As a result of Defendants' infringement, FlexShopper has been damaged in an amount equal to the loss of profits that would otherwise have accrued to FlexShopper from providing its patented technology to third-party e-commerce entities, including leasing revenues and fees paid by consumers for goods purchased from such third-party e-commerce websites on an RTO basis, but in no event less than a reasonable royalty.

125.   Defendants' continuing acts of infringement are a basis of consumer demand for the infringing products and services.  Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to FlexShopper, for which FlexShopper has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.  The hardships that an injunction would impose are less than those faced by FlexShopper should an injunction not issue.  The public interest would be served by issuance of an injunction.

126.   Defendants' direct and indirect infringement of the '682 patent has been willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284.

**FOURTH CAUSE OF ACTION**
**Infringement of U.S. Patent No. 10,282,778**

127.   Plaintiff re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs as though fully set forth herein.

128.   FlexShopper is the current exclusive owner and assignee of all right, title, and interest in and to U.S. Patent No. 10,282,778 (the "'778 patent"), titled "Computer Implemented System and Method for a Rent-to-own Program," duly and legally issued by the United States

Patent and Trademark Office on May 7, 2019, including the right to bring this suit for injunctive relief and damages. A true and correct copy of the '778 patent is attached hereto as Exhibit D.

129. The '778 patent is valid and enforceable.

130. Defendants have infringed and continue to infringe the '778 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products (*e.g.*, software, website plug-ins, and/or related hardware) and systems that include such products that practice the claims of the '778 patent, including in connection with enabling e-commerce websites associated with third-party e-commerce entities to sell goods to consumers on an RTO basis.

131. As a non-limiting example, Defendants have infringed and continue to infringe claim 1 of the '778 patent. Claim 1 recites:

> 1. A system, comprising:
> a consumer computer device;
> a rent-to-own (RTO) computer device comprising a RTO management application, wherein the RTO management application is programmed to provide a plurality of RTO user interfaces; and
> a retailer computer device in communication with the consumer computer device and the RTO computer device, wherein the retailer computer device comprises:
>> a retailer application, wherein the retailer application is executable by the retailer computer device to:
>>> serve a retailer web page to the consumer computer device, wherein the retailer web page comprises a plurality of product regions, wherein each product region comprises information describing a product available for purchase;
>>> receive, via the retailer web page and from the consumer computer device, a selection of a product to be purchased; and
>>> provide, via the retailer web page, a list of payment options in a payment option field, wherein each payment option is selectable to pay for the selected product; and
>> a RTO plug-in, wherein the RTO plug-in is executable by the retailer computer device to:
>>> integrate a RTO control element into the payment option field, wherein the RTO control element is selectable to initiate an online RTO transaction; and

after selection of the RTO control element, receive a payment call from the retailer application to execute an RTO payment routine to purchase the selected product via the online RTO transaction through the retailer web page, wherein the RTO payment routine comprises:

integrating, via the RTO plug-in, one or more than one RTO user interface, received from the RTO management application, into a portion of the retailer web page served, by the retailer application, to the consumer computer device;

wherein the retailer computer device further comprises an application program interface (API), and wherein the retailer application is further executable by the retailer computer device to:

invoke a command of the API directed to the RTO plug-in to execute the RTO payment routine.

132. Upon information and belief, Defendants have directly infringed and continue to directly infringe claim 1 of the '778 Patent under 35 U.S.C. § 271(a) by making and using the claimed system when testing and demonstrating their products (*e.g.*, software, website plug-ins, and related hardware) to show potential consumers and third-party e-commerce entities how Defendants' products enable e-commerce websites to integrate RTO payment options and enable consumers to purchase goods from such websites on an RTO basis. For example, upon information and belief, Defendants make, own, and/or operate their own consumer computer devices, retailer computer devices, retailer applications, and retailer web pages, which are then used by Defendants to integrate their RTO products to confirm that their RTO products are functioning correctly and reliably. Upon information and belief, upon installing their products onto their own retailer computers/applications/webpages, Defendants use their consumer computer devices to communicate with such retailer computers/applications/webpages to simulate acquiring goods on an RTO basis to confirm proper functioning of their RTO products (*e.g.*, software, website plug-ins, and related hardware).

133. Upon information and belief, Defendants also separately have directly infringed and continue to directly infringe claim 1 of the '778 Patent under 35 U.S.C. § 271(a) at least

because they make the claimed system unrelated to any product testing. Specifically, on information and belief, Defendants make the portion of the claimed system corresponding to the "rent-to-own (RTO) computer device comprising a RTO management application" and the "RTO plug-in." On information and belief, Defendants are also vicariously liable for the consumer's making of the portion of the claimed system corresponding to the "consumer computer device," and the third-party e-commerce entity's making of the portion of the claimed system corresponding to the "retailer computer device" comprising "a retailer application" and "application program interface (API)."

134.    As to the RTO computer device, on information and belief, Defendants own, operate, manage, or have operated/managed on their behalf, computers/servers that include an RTO management application. The RTO management application is programmed to provide a plurality of RTO user interfaces. These system components enable Defendants to review and approve consumer requests to acquire goods from the third-party e-commerce entities on an RTO basis. *See, e.g.*, *id.* ("Quick pre-approval[;] After completing our brief online application, customers receive a decision within seconds with their amount prior to shopping."); https://www.acima.com/en ("With Acima Leasing, our flexible, lease-to-own solutions can help you take home a new sofa, TV, mattress, mobile phone, tires and more."); *id.* ("Acima will purchase products up to your lease line amount for lease to you.").

135.    Defendants also make and provide the claimed RTO plug-in to third-party e-commerce entities to enable the e-commerce entities' websites to complete online RTO transactions. *See, e.g.*, https://www.acima.com/en/ecommerce ("Our eCommerce lease-to-own solution empowers customers to shop for the items they want, all without using credit.* The results are in – on average, retailers that use Acima's eCommerce experience: Less cart abandonment; Up

to 30% more sales; Up to 2x ticket size; Higher approval rates"). The RTO plug-in is executable by the retailer computer device to integrate a selectable RTO control element into a payment option field of a retailer web page served to the consumer computer device. *Id.* ("Easy Integration Robust API and Pre-built Shopping Cart Plugins"); *id.* ("Customer never leaves your site[;] Unlike some providers, with Acima eCommerce, customers can complete their transaction without leaving your site."). The RTO plug-in is also configured to integrate one or more RTO user interfaces received from the RTO management application into a portion of the retailer web page served to the consumer computer device. *See supra*, ¶¶56-62, 81-83.

136.   While the consumer makes/provides the portion of the claimed system corresponding to the "consumer computer device," Defendants are vicariously liable for such making/providing. Defendants direct and control the consumer to provide the consumer computer device to the claimed system at least by conditioning the benefit of purchasing the goods on an RTO basis on such making/providing by the consumer. For example, completion of the RTO transaction (and the corresponding benefit to the consumer) is conditioned on the consumer computer device selecting a product to be purchased and selecting the RTO control element to initiate an online RTO transaction for the product selected. Defendants also establish the manner and/or timing of the consumers' provision of the consumer computer device—*e.g.*, the consumer computer device makes the selection of the product and RTO control element before the RTO transaction can be completed.

137.   Similarly, while the third-party e-commerce entity makes/provides the portion of the claimed system corresponding to the "retailer computer device" comprising "a retailer application" and "application program interface (API)," Defendants are vicariously liable for such making/providing. Defendants direct and control the third-party e-commerce entity to provide the

retailer computer device having the retailer application and API at least by conditioning the benefit to the e-commerce entity of being able to sell goods to consumers on the basis of an RTO transaction on the third-party e-commerce entity's provision of these system components.  For example, on information and belief, the RTO plug-in that Defendants provide to the third-party e-commerce entity needs to be executed by the retailer computer device to integrate a selectable RTO control element into the payment option field of the retailer web page served to the consumer computer device to facilitate and complete the RTO transaction.  *See, e.g.*, https://www.acima.com/en/ecommerce ("Customer never leaves your site[;] Unlike some providers, with Acima eCommerce, customers can complete their transaction without leaving your site."), *id.* ("Pre-Approval Widgets[;] Easily Integrate Acima's marketing resources on your website to drive conversion."); *see also* https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:51 – on information and belief, showing Acima as a payment option at checkout page). Without the e-commerce entity making/providing these system components, Defendants do not confer the benefit of their RTO plug-in and other software/hardware to enable the e-commerce entity's website to sell goods on an RTO basis.  Defendants also establish the manner and/or timing of the third-party e-commerce entity's provision of these e-commerce entity system components— *e.g.*, the e-commerce entity needs to provide a retailer application that provides a retailer web page having a payment option field, otherwise Defendants' RTO plug-in cannot integrate the RTO control element in the payment option field.

138.    Defendants are also vicariously liable for the third-party e-commerce entity making/providing the portion of the claimed system corresponding to the "retailer computer device" comprising "a retailer application" and "application program interface (API)" because, on information and belief, the Defendants and the third-party e-commerce entity form a joint

enterprise. On information and belief, Defendants and the third-party e-commerce entities have an express or implied agreement to create a system that is capable of selling goods to the consumer on an RTO basis—said system infringing claim 1 of the '778 Patent. Defendants and the third-party e-commerce entity have a common purpose to create the claimed system that is capable of selling goods to the consumers on an RTO basis. Defendants and the third-party e-commerce entity have a community of pecuniary interest in that purpose as Defendants and the third-party e-commerce entity will derive a tangible benefit from being able to sell goods on an RTO basis—*e.g.*, the e-commerce entity and Defendants will be able to make money on leasing payments and complete a sale that they otherwise would not have. On information and belief, Defendants and the third-party e-commerce entity have an equal right to a voice in the direction of the enterprise. For example, on information and belief, any one of these parties may decide to not move forward with the sale of the good based on an RTO transaction using the e-commerce website.

139.    Defendants partner with various third-party e-commerce entities by providing them products (*e.g.*, software, website plug-ins, and/or related hardware) that enable the e-commerce entities to sell goods to consumers on an RTO basis on their e-commerce websites. *See, e.g.*, https://www.acima.com/en/ecommerce ("Easy Integration. Robust API and Pre-built Shopping Cart Plugins.").[9] Consumers use their consumer computer devices to communicate and interact with these third-party e-commerce websites, the latter having been modified by Defendants' RTO products to enable RTO transactions, to purchase goods from the e-commerce websites on an RTO

---

[9]    On information and belief, www.JustWheelsDirect.com and diamondcity.biz are just two examples e-commerce websites that used and/or still use Defendants' infringing product that enables the websites to sell their products to consumers on an RTO basis. On information and belief, there are numerous other such e-commerce websites that used and/or currently use Defendants' infringing products. *See, e.g.*, https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores."); https://www.acima.com/en/ecommerce.

basis.  In the process, the consumers use the claimed system of claim 1 of the '778 Patent and are direct infringers under 35 U.S.C. § 271(a).

140.    Even if certain aspects of the claimed system are not owned by a consumer, their use of the claimed system makes them a direct infringer of the '778 Patent.  In particular, the consumer puts the claimed system into service by controlling the system as a whole and obtaining benefit from it.  For example, the consumer, on information and belief, using their consumer computer device, communicates with a retailer computer device with the desire of purchasing products on an RTO basis.  More specifically, the consumer communicates with a retailer web page provided by a retailer application that runs on the retailer computer device.  The retailer web page includes a plurality of product regions that each describe a product available for purchase and list of payment options in a payment option field.  One non-limiting example of such a website accessible to the consumer using their consumer computer device is shown below:



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:32).



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:34).



*See, e.g.*, https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:36).

141.    On information and belief, the consumer continues to control the system by selecting the product she wishes to purchase and selects an RTO control element that is integrated as a payment option in the in the retailer web page to initiate the online RTO transaction for the product the consumer selected.  By making these selections, the consumer causes an RTO plug-in

to receive a payment call from the retailer application to execute an RTO payment routine to purchase the selected product via the online RTO transaction through the retailer web page, where the RTO payment routine integrates one or more RTO user interfaces received from the RTO management application into a portion of the retailer web page.  The selections relatedly cause the retailer computer device to invoke a command of an API of the retailer computer device directed to the RTO plug-in to execute the RTO payment routine.  *See supra*, ¶¶56-62, 81-83; *see also* https://www.acima.com/en/ecommerce ("Robust API"), *id.* ("Rest API[;] Acima is organized around REST. Our API has predictable, resource-oriented URLs and uses HTTP response codes to indicate API errors.").

142.    The consumer derives a benefit from each claimed component of the system of claim 1.  For example, the consumer benefits from the consumer computer device by communicating with the retailer web page to select a product for the RTO transaction.  The consumer also benefits from the retailer web page by selecting goods for the RTO transaction and the RTO plug-in that allows the consumer to beneficially select RTO as the payment option.  The consumer also benefits from the retailer computer device's API as an API command is invoked to the RTO plug-in to execute the RTO payment routine, which allows the consumer to continue with the RTO transaction process.

143.    While, as explained above, the consumer is a direct infringer in their own right, Defendants have directly infringed and continue to directly infringe under 35 U.S.C. § 271(a) separately because they are vicariously liable for the customers' use of the system of claim 1.  Defendants direct and control the consumer to use the claimed system of claim 1 at least by conditioning the benefit of purchasing the goods on an RTO basis on such system use by the consumer.  For example, Defendants require the consumer to use the system to provide a selection

of products for acquisition and select the RTO control element otherwise the RTO transaction would be denied.  Defendants also establish the manner and/or timing of the consumers' use of the claimed system—*e.g.*, Defendants require that the consumer use the system to select the products for acquisition and the RTO control element before the RTO payment routine is executed and RTO user interfaces are integrated into the retailer web page for carrying out the RTO transaction.

144.    Defendants have had actual knowledge of the '778 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint.  Moreover, on information and belief, Defendants have had actual knowledge of the '778 Patent and details of Defendants' infringement thereof since approximately September 2022, when FlexShopper and a senior corporate officer of Defendants had a meeting in which they discussed, among other things, FlexShopper's patent portfolio.  On information and belief, Defendants have also known about the '778 Patent since at least Oct. 5, 2021 when the '778 Patent was cited as prior art in an office action against one of Defendants' pending patent applications.  On information and belief, Defendants reviewed the '778 Patent in order to respond to the office action.  Notwithstanding Defendants' actual knowledge of the '778 Patent and their infringement, Defendants continued to infringe claim 1 of the '778 Patent.

145.    As explained above, consumers directly infringed and continue to infringe the '778 Patent. *See supra*, ¶¶139-142.  Defendants actively and knowingly induced and continue to induce the consumers' direct infringement and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(b).  For example, Defendants provide consumers with a list of online retailers that feature Defendants' RTO products that consumers access and use the claimed system. *See, e.g.*, https://www.acima.com/en/marketplace.  Defendants further provide advertising, publications, technical support, and other documentation to encourage consumers to use the

69

claimed system available at various e-commerce websites. *See, e.g.*, https://www.acima.com/en/support (featuring FAQs about leasing (https://www.acima.com/en/support/what-is-acima), the application process (https://www.acima.com/en/support/how-to-apply), lease agreements (https://www.acima.com/en/support/lease-agreements), payment information (https://www.acima.com/en/support/payment-faqs), and service and support (https://www.acima.com/en/support/service-support-faqs)).  Defendants also feature a live chat and phone number for consumers to call to seek assistance on how to use the claimed system. *See, e.g.*, https://www.acima.com/en/support/service-support-faqs.  These deliberate and intentional acts led and continue to lead consumers to directly infringe the '778 Patent.

146.    On information and belief, Defendants knew and intended their actions to induce consumers' direct infringement.  For example, e-commerce websites featuring Defendants' products (*e.g.*, software, website-plugins, and related hardware) were specifically designed to provide RTO transactions in an infringing manner to consumers using these systems. *See supra*, ¶¶140-141.  Defendants also have had actual knowledge of the '778 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as Oct. 5, 2021.  *See supra*, ¶144.

147.    Defendants have also contributed to and continue to contribute to the customers' direct infringement of the '778 Patent and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(c).  Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) make up the claimed "RTO system" and "RTO plug-in," which are components of the claimed system. *See supra*, ¶¶133-135.  They are also a material part of the claimed invention as their use provides consumers the ability to acquire goods from e-commerce

websites on an RTO basis. *Id.* at ¶¶140-141. Defendants also knew that their products were especially made or adapted for use in a manner that infringe the '778 Patent when they provided the products to form the system that is used by the consumer.

148. Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) are not staple articles of commerce capable of any substantial non-infringing use. Indeed, their only use is to provide consumers the option of purchasing goods from e-commerce websites on an RTO basis in an infringing manner.

149. On information and belief, Defendants also knew that providing their products to form the claimed system would contribute to the consumers' direct infringement of the '778 Patent. For example, Defendants' products were specifically designed to cause the third-party e-commerce entities' websites to enable RTO transactions and allow consumers to purchase goods from these websites on an RTO basis. *See supra*, ¶¶133-135, 140-141. Defendants also have had actual knowledge of the '778 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as October 5, 2021. *See supra*, ¶144.

150. Defendants are not and have never been licensed or otherwise authorized by FlexShopper to practice the claims of the '778 Patent.

151. By reason of Defendants' infringing activities, FlexShopper has suffered substantial damages, and will continue to suffer substantial damages, in an amount to be proven at trial. But for Defendants' infringement of the '778 Patent, FlexShopper would have provided third-party e-commerce entities with the patented FlexShopper technology that they needed to facilitate the sale of goods on an RTO basis to consumers and/or licensed the '778 Patent to Defendants so that Defendants could implement products and services to facilitate the sale of

goods on an RTO basis to consumers via third-party e-commerce websites. As a result of Defendants' infringement, FlexShopper has been damaged in an amount equal to the loss of profits that would otherwise have accrued to FlexShopper from providing its patented technology to third-party e-commerce entities, including leasing revenues and fees paid by consumers for goods purchased from such third-party e-commerce websites on an RTO basis, but in no event less than a reasonable royalty.

152.   Defendants' continuing acts of infringement are a basis of consumer demand for the infringing products and services. Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to FlexShopper, for which FlexShopper has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court. The hardships that an injunction would impose are less than those faced by FlexShopper should an injunction not issue. The public interest would be served by issuance of an injunction.

153.   Defendants' direct and indirect infringement of the '778 patent has been willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284.

**FIFTH CAUSE OF ACTION**
**Infringement of U.S. Patent No. 10,891,687**

154.   Plaintiff re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs as though fully set forth herein.

155.   FlexShopper is the current exclusive owner and assignee of all right, title, and interest in and to U.S. Patent No. 10,891,687 (the "'687 patent"), titled "Computer Implemented System and Method for a Rent-to-own Program," duly and legally issued by the United States Patent and Trademark Office on January 12, 2021, including the right to bring this suit for

injunctive relief and damages.  A true and correct copy of the '687 patent is attached hereto as Exhibit E.

156.    The '687 patent is valid and enforceable.

157.    Defendants have infringed and continue to infringe the '687 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products (*e.g.*, software, website plug-ins, and/or related hardware) and systems that include such products that practice the claims of the '687 patent, including in connection with enabling e-commerce websites associated with third-party e-commerce entities to sell goods to consumers on an RTO basis.

158.    As a non-limiting example, Defendants have infringed and continue to infringe claim 1 of the '687 patent.  Claim 1 recites:

> 1. A system, comprising:
> an e-commerce server configured for electronic communication, via a network, with a consumer device; and
> a rent-to-own (RTO) system comprising a RTO management application, the e-commerce server further configured for electronic communication, via the network, with the RTO system,
> wherein the e-commerce server comprises:
> an e-commerce application configured to provide, via the network, an e-commerce website to the consumer device, wherein the e-commerce website comprises a plurality of e-commerce user interfaces including an e-commerce user interface associated with a good, wherein the e-commerce user interface associated with the good includes information corresponding to the good; and
> a RTO plug-in integrated with the e-commerce application to facilitate a RTO transaction through the e-commerce website, wherein the RTO plug-in is executable by the e-commerce server to:
> integrate a RTO control element in the e-commerce user interface associated with the good, wherein the RTO control element is selectable to acquire the good using the RTO transaction; and
> after selection of the RTO control element, provide to the consumer device, via the network, one or more than one RTO user interface received from the RTO management application, to facilitate completion of the RTO transaction through the e-commerce web site, and

wherein the RTO management application is configured to provide a plurality of RTO user interfaces including the one or more than one RTO user interface to the e-commerce server.

159.    Upon information and belief, Defendants have directly infringed and continue to directly infringe claim 1 of the '687 Patent under 35 U.S.C. § 271(a) by making and using the claimed system when testing and demonstrating their products (*e.g.*, software, website plug-ins, and related hardware) to show potential consumers and third-party e-commerce entities how Defendants' products enable e-commerce websites to integrate RTO payment options and enable consumers to purchase goods from such websites on an RTO basis.  For example, upon information and belief, Defendants make, own, and/or operate their own e-commerce servers, e-commerce applications, and e-commerce websites used for testing, demonstrations, and simulations. Defendants integrate their RTO products into these e-commerce servers/applications/websites to confirm that their RTO products are functioning correctly and reliably.  Upon information and belief, upon installing their products onto their own e-commerce servers/applications/websites, Defendants use consumer computer devices to communicate with such e-commerce servers/applications/websites to simulate acquiring goods on an RTO basis to confirm proper functioning of their RTO products (*e.g.*, software, website plug-ins, and related hardware).

160.    Upon information and belief, Defendants also separately have directly infringed and continue to directly infringe claim 1 of the '687 Patent under 35 U.S.C. § 271(a) at least because they make the claimed system unrelated to any product testing.  Specifically, on information and belief, Defendants make the portion of the claimed system corresponding to the "rent-to-own (RTO) system comprising an RTO management application" and the "RTO plug-in." On information and belief, Defendants are also vicariously liable for the third-party e-commerce entity's making of the portion of the claimed system corresponding to the "e-commerce server" comprising "an e-commerce application."

161.    As to the RTO system, on information and belief, Defendants own, operate, manage, or have operated/managed on their behalf, an RTO system that includes an RTO management application.  The RTO system is configured to communicate with the e-commerce server and the RTO management application is configured to provide a plurality of RTO user interfaces to the e-commerce server.  These system components enable Defendants to review and approve consumer requests to acquire goods from the third-party e-commerce entities on an RTO basis.  *See, e.g.*, *id.* ("Quick pre-approval[;] After completing our brief online application, customers receive a decision within seconds with their amount prior to shopping."); https://www.acima.com/en ("With Acima Leasing, our flexible, lease-to-own solutions can help you take home a new sofa, TV, mattress, mobile phone, tires and more."); *id.* ("Acima will purchase products up to your lease line amount for lease to you.").

162.    Defendants also make and provide the claimed RTO plug-in to third-party e-commerce entities to enable the e-commerce entities' websites to complete online RTO transactions.  *See, e.g.*, https://www.acima.com/en/ecommerce ("Our eCommerce lease-to-own solution empowers customers to shop for the items they want, all without using credit.* The results are in – on average, retailers that use Acima's eCommerce experience: Less cart abandonment; Up to 30% more sales; Up to 2x ticket size; Higher approval rates").  The RTO plug-in is executable by an e-commerce server to integrate a selectable RTO control element in the e-commerce user interface.  *Id.* ("Easy Integration Robust API and Pre-built Shopping Cart Plugins"); *id.* ("Customer never leaves your site[;] Unlike some providers, with Acima eCommerce, customers can complete their transaction without leaving your site.").  The RTO plug-in is also configured to provide one or more RTO user interfaces received from the RTO management application to a consumer device after the RTO control element has been selected.  *See supra*, ¶¶56-62, 81-83.

163.    While the third-party e-commerce entity makes/provides the portion of the claimed system corresponding to the "e-commerce server" comprising "an e-commerce website application," Defendants are vicariously liable for such making/providing.  Defendants direct and control the third-party e-commerce entity to provide the e-commerce server having the e-commerce application at least by conditioning the benefit to the e-commerce entity of being able to sell goods to consumers on the basis of an RTO transaction on the third-party e-commerce entity's provision of these system components.  For example, on information and belief, the RTO plug-in that Defendants provide to the third-party e-commerce entity needs to be integrated with the e-commerce application and needs to be executed by an e-commerce server to integrate a selectable RTO control element in the e-commerce user interface associated with the good in order to facilitate the RTO transaction.  *See, e.g.*, https://www.acima.com/en/ecommerce ("Customer never leaves your site[;] Unlike some providers, with Acima eCommerce, customers can complete their transaction without leaving your site."), *id.* ("Pre-Approval Widgets[;] Easily Integrate Acima's marketing resources on your website to drive conversion."); *see also* https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:51 – on information and belief, showing Acima as a payment option at checkout page).  Without the e-commerce entity making/providing these system components, Defendants do not confer the benefit of their RTO plug-in and other software/hardware to enable the e-commerce entity's website to sell goods on an RTO basis.  Defendants also establish the manner and/or timing of the third-party e-commerce entity's provision of these e-commerce entity system components—*e.g.*, the e-commerce entity needs to provide an e-commerce application that provides an e-commerce website having an e-commerce user interface associated with a good, otherwise Defendants' RTO plug-in cannot

integrate the RTO control element in the e-commerce user interface to facilitate the RTO transaction.

164.    Defendants are also separately vicariously liable for the third-party e-commerce entity's making of the system because, on information and belief, the Defendants and the third-party e-commerce entity form a joint enterprise.  As such, Defendants can be charged with the making of the e-commerce server/application components, as described above.  On information and belief, Defendants and the third-party e-commerce entities have an express or implied agreement to create a system that is capable of selling goods to a consumer on an RTO basis—said system infringing claim 1 of the '687 Patent.  Defendants and the third-party e-commerce entity have a common purpose to create the claimed system that is capable of selling goods to consumers on an RTO basis.  Defendants and the third-party e-commerce entity have a community of pecuniary interest in that purpose as Defendants and the third-party e-commerce entity will derive a tangible benefit from being able to sell goods on an RTO basis—*e.g.*, the e-commerce entity and Defendants will be able to make money on leasing payments and complete a sale that they otherwise would not have.  On information and belief, Defendants and the third-party e-commerce entity have an equal right to a voice in the direction of the enterprise.  For example, on information and belief, either the Defendants or third-party e-commerce entities can choose to terminate their relationship and end selling the third-party e-commerce entities' goods to consumers on an RTO basis.

165.    Defendants partner with various third-party e-commerce entities by providing them products (*e.g.*, software, website plug-ins, and/or related hardware) that enable the e-commerce entities to sell goods to consumers on an RTO basis on their e-commerce websites.  *See, e.g.*, https://www.acima.com/en/ecommerce ("Easy Integration. Robust API and Pre-built Shopping

Cart Plugins.").[10]    Consumers use these third-party e-commerce websites, which have been modified by Defendants' RTO products to enable RTO transactions, to purchase goods on an RTO basis.  In the process, the consumers use the claimed system of claim 1 of the '687 Patent and are direct infringers under 35 U.S.C. § 271(a).

166.    Even if the claimed system is not owned by a consumer, their use of the claimed system makes them a direct infringer of the '687 Patent.  In particular, the consumer puts the claimed system into service by controlling the system as a whole and obtaining benefit from it.  For example, on information and belief, the consumer communicates with an e-commerce server using their consumer device with the desire of purchasing goods on an RTO basis.  More specifically, the consumer communicates with an e-commerce website provided by an e-commerce application that runs on the e-commerce server.  The e-commerce website includes a plurality of e-commerce user interfaces, including a user interface associated with a good the consumer wishes to acquire on an RTO basis.  One non-limiting example of such a website accessible to the consumer using their consumer device is shown below:

---

[10]    On information and belief, www.JustWheelsDirect.com and diamondcity.biz are just two examples e-commerce websites that used and/or still use Defendants' infringing product that enables the websites to sell their products to consumers on an RTO basis.  On information and belief, there are numerous other such e-commerce websites that used and/or currently use Defendants' infringing products.  *See, e.g.*, https://www.acima.com/en/how-it-works ("Choose from over 15,000 retail stores."); https://www.acima.com/en/ecommerce.



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:32).



https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:33-0:34).



*See, e.g.*, https://www.youtube.com/watch?v=Ax2aKbFlick (time 0:36).

167.    On information and belief, the consumer continues to control the system by selecting an RTO control element that is integrated as a payment option in the e-commerce user interface associated with the good to initiate the online RTO transaction for the good.  By making this selection, the consumer causes an RTO plug-in integrated with the e-commerce application to provide to the consumer device one or more RTO user interfaces from the RTO management application to facilitate the RTO transaction.

168.    The consumer derives a benefit from each claimed component of the system of claim 1.  For example, the consumer benefits from the e-commerce server/website by selecting goods for the RTO transaction and the RTO plug-in that is integrated into the website application allows the consumer to beneficially select RTO as the payment option.  The consumer additionally benefits from the RTO system and associated RTO management application because the latter provides the one or more RTO user interfaces to the e-commerce server, which are used by the e-commerce server and consumer to complete the RTO transaction.

169.    While, as explained above, the consumer is a direct infringer in their own right, Defendants have directly infringed and continue to directly infringe under 35 U.S.C. § 271(a) separately because they are vicariously liable for the customer's use of the system of claim 1. Defendants direct and control the consumer to use the claimed system of claim 1 at least by conditioning the benefit of purchasing the goods on an RTO basis on such system use by the consumer.  For example, Defendants require the consumer to use the system to provide a selection of goods for acquisition and select the RTO control element, otherwise the RTO transaction would be denied.  Defendants also establish the manner and/or timing of the consumer's use of the claimed system—*e.g.*, Defendants require that the consumer use the system to select the goods for acquisition and the RTO control element before the RTO plug-in provides the RTO user interfaces to the consumer device.  The RTO user interfaces are used by the consumer to facilitate completion of the RTO transaction for the good selected.

170.    Defendants have had actual knowledge of the '687 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint.  Moreover, on information and belief, Defendants have had actual knowledge of the '687 Patent and details of Defendants' infringement thereof since approximately September 2022, when FlexShopper and a senior corporate officer of Defendants had a meeting in which they discussed, among other things, FlexShopper's patent portfolio.  Defendants have also known about the '778 Patent, which is part of the same family as the '687 Patent, since at least Oct. 5, 2021, when the '778 Patent was cited as prior art in an office action against one of Defendants' pending patent applications.  On information and belief, this fact supports the conclusion that Defendants researched and reviewed other issued patents related to the '778 Patent (*i.e.*, part of the same patent family), including the '687 Patent, and that Defendants separately have known about the '687 Patent since on or shortly

after October 5, 2021. Notwithstanding Defendants' actual knowledge of the '687 Patent and their infringement, Defendants continued to infringe claim 1 of the '687 Patent.

171.    As explained above, consumers directly infringed and continue to infringe the '687 Patent. *See supra*, ¶¶165-168. Defendants actively and knowingly induced and continue to induce the consumers' direct infringement and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(b). For example, Defendants provide consumers with a list of online retailers that feature Defendants' RTO products that consumers access and use the claimed system. *See, e.g.*, https://www.acima.com/en/marketplace. Defendants further provide advertising, publications, technical support, and other documentation to encourage consumers to use the claimed system available at various e-commerce websites. *See, e.g.*, https://www.acima.com/en/support (featuring FAQs about leasing (https://www.acima.com/en/support/what-is-acima), the application process (https://www.acima.com/en/support/how-to-apply), lease agreements (https://www.acima.com/en/support/lease-agreements), payment information (https://www.acima.com/en/support/payment-faqs), and service and support (https://www.acima.com/en/support/service-support-faqs)). Defendants also feature a live chat and phone number for consumers to call to seek assistance on how to use the claimed system. *See, e.g.*, https://www.acima.com/en/support/service-support-faqs. These deliberate and intentional acts led and continue to lead consumers to directly infringe the '687 Patent.

172.    On information and belief, Defendants knew and intended their actions to induce consumers' direct infringement. For example, e-commerce websites featuring Defendants' products (*e.g.*, software, website-plugins, and related hardware) were specifically designed to provide RTO transactions in an infringing manner to consumers using these systems. *See supra*,

¶¶166-167.  Defendants also have had actual knowledge of the '687 Patent and details of Defendants' infringement thereof at least as of the filing and service of this Complaint and, on information and belief, as early as Oct. 5, 2021.  *See supra*, ¶170.

173.   Defendants have also contributed to and continue to contribute to the customers' direct infringement of the '687 Patent and, therefore, Defendants are liable for indirect infringement under 35 U.S.C. § 271(c).  Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) make up the claimed "RTO system" and "RTO plug-in," which are components of the claimed system.  *See supra*, ¶¶160-162.  They are also a material part of the claimed invention as their use provides consumers the ability to acquire goods from e-commerce websites on an RTO basis.  *Id.* at ¶¶166-167.  Defendants also knew that their products were especially made or adapted for use in a manner that infringe the '687 Patent when they provided the products to form the system that is used by the consumer.

174.   Defendants' products (*e.g.*, software, website plug-ins, and/or related hardware) are not staple articles of commerce capable of any substantial non-infringing use.  Indeed, their only use is to provide consumers the option of purchasing goods from e-commerce websites on an RTO basis in an infringing manner.

175.   On information and belief, Defendants also knew that providing their products to form the claimed system would contribute to the consumers' direct infringement of the '687 Patent.  For example, Defendants' products were specifically designed to cause the third-party e-commerce entities' websites to enable RTO transactions and allow consumers to purchase goods from these websites on an RTO basis.  *See supra*, ¶¶160-162, 166-168.  Defendants also have had actual knowledge of the '687 Patent and details of Defendants' infringement thereof at least as of the

filing and service of this Complaint and, on information and belief, as early as October 5, 2021. *See supra*, ¶170.

176.    Defendants are not and have never been licensed or otherwise authorized by FlexShopper to practice the claims of the '687 Patent.

177.    By reason of Defendants' infringing activities, FlexShopper has suffered substantial damages, and will continue to suffer substantial damages, in an amount to be proven at trial.  But for Defendants' infringement of the '687 Patent, FlexShopper would have provided third-party e-commerce entities with the patented FlexShopper technology that they needed to facilitate the sale of goods on an RTO basis to consumers and/or licensed the '687 Patent to Defendants so that Defendants could implement products and services to facilitate the sale of goods on an RTO basis to consumers via third-party e-commerce websites.  As a result of Defendants' infringement, FlexShopper has been damaged in an amount equal to the loss of profits that would otherwise have accrued to FlexShopper from providing its patented technology to third-party e-commerce entities, including leasing revenues and fees paid by consumers for goods purchased from such third-party e-commerce websites on an RTO basis, but in no event less than a reasonable royalty.

178.    Defendants' continuing acts of infringement are a basis of consumer demand for the infringing products and services.  Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to FlexShopper, for which FlexShopper has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.  The hardships that an injunction would impose are less than those faced by FlexShopper should an injunction not issue.  The public interest would be served by issuance of an injunction.

179.    Defendants' direct and indirect infringement of the '687 patent has been willful and deliberate, justifying a trebling of damages under 35 U.S.C. § 284.

## PRAYER FOR RELIEF

WHEREFORE, FlexShopper respectfully requests the following relief from this Court:

A.    A judgment that Defendants have infringed and continue to infringe each and every one of the Asserted Patents;

B.    A permanent injunction against Defendants, their respective officers, agents, servants, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and those persons in active concert or participation with them, enjoining them from infringement, inducement of infringement, and contributory infringement of each and every one of the Asserted Patents, including but not limited to an injunction against making, using, selling, and/or offering for sale within the United States, and/or importing into the United States, any products and/or services that infringe the Asserted Patents;

C.    Lost profits damages resulting from Defendants' infringement of the Asserted Patents;

D.    A reasonable royalty for Defendants' use of FlexShopper's patented technology, as alleged herein;

E.    Pre-judgment interest;

F.    Post-judgment interest;

G.    A judgment holding Defendants' infringement of the Asserted Patents to be willful, and a trebling of damages pursuant to 35 U.S.C. § 284;

H.    A declaration that this Action is exceptional pursuant to 35 U.S.C. § 285, and an award to FlexShopper of its attorneys' fees, costs and expenses incurred in connection with this Action; and

I.      Such other relief as the Court deems just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, FlexShopper demands a trial by jury on all matters and issues triable by jury.

Dated: September 30, 2024

*/s/ Tigran Guledjian by permission Claire Henry*
Tigran Guledjian
LEAD ATTORNEY
California State Bar No. 207613
tigranguledjian@quinnemanuel.com
Christopher A. Mathews
California State Bar No. 144021
chrismathews@quinnemanuel.com
Scott L. Watson
California State Bar No. 219147
scottwatson@quinnemanuel.com
Razmig Messerian
California State Bar No. 260142
razmesserian@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Phone: (213) 443-3000
Fax: (213) 443-3100

Jordan B. Kaericher
State Bar No. 24132636
jordankaericher@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
3100 McKinnon St, Suite 1125
Dallas, TX 75201
Phone: (469) 902-3600
Fax: (469) 902-3610

Of Counsel:
Claire Abernathy Henry
State Bar No. 24053063
claire@wsfirm.com
Andrea L. Fair

State Bar No. 24078488
andrea@wsfirm.com
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)

*ATTORNEYS FOR PLAINTIFF*
*FLEXSHOPPER, INC.*